'FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

'02 SEP 26 PM 2:08

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

POWERLINE SAND, INC., a Florida
Corporation,

        Plaintiff,

v.

HORNBLOWER MARINE SERVICES, INC., a
California corporation,

        Defendant.

_____/

Case No. 3:02-CV-907-J-16TEM

## DEFENDANT'S NOTICE OF REMOVAL

Defendant, Hornblower Marine Services, Inc. (hereafter referred to as "Hornblower"), by and through its undersigned attorneys, and, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, hereby gives notice, with full reservation of all defenses, that this action is removed from the Circuit Court of the Fourth Judicial Circuit, in and for Duval County, Florida to the United States District Court for the Middle District of Florida, Jacksonville Division.   In support of removal, Hornblower states as follows:

## I. INTRODUCTION

1.    This lawsuit is a civil action within the meaning of the acts of Congress relating to the removal of cases.  See 28 U.S.C. §§ 1441(b) and 1332.

2.    On October 18, 2001 Powerline Sand, Inc. (hereafter referred to as "Powerline Sand") filed this action in the State of Florida Circuit Court in and for Duval County, Florida against Hornblower for damages based upon a promissory estoppel

1

theory of liability under Florida law. <u>See</u> <u>Complaint</u> paragraphs 5-6 and 8 through 13. The State of Florida Circuit Court case is pending at Case No. 01-06957, Division CV-D.

3.   On October 30, 2001 Hornblower was served with a copy of the Complaint.

4.   This Notice of Removal is timely, as it is filed within thirty (30) days of receipt by Hornblower of papers whereby it first became apparent that the amount in controversy of this case exceeds $75,000.00, exclusive of interest and costs. <u>See</u> 28 U.S.C. § 1446(b). A true and correct copy of all pleadings, process, orders, and other papers filed in this action is attached hereto as composite Exhibit "A." Furthermore, this notice of removal is filed within one year of the commencement of the state court action. *See id.*

5.   As set forth in greater detail below, this Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because (1) there is complete diversity of citizenship between Powerline Sand and Hornblower and (2) the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

## II. BASIS FOR REMOVAL

### A. Diversity Jurisdiction

**1.   Complete diversity of citizenship
exists between Powerline Sand and Hornblower.**

6.   Removal of this action is proper because complete diversity of citizenship exists between the parties. 28 U.S.C. § 1332(a). For purposes of diversity jurisdiction, a

corporation is "deemed to be a citizen of any State by which it has been incorporated and of the State in which it has its principal place of business..." 28 U.S.C. § 1332(c)(1).[1]

7.      At the time of the filing of the Complaint, Hornblower was and is a California corporation with its principal place of business located in the State of Indiana. By contrast, at the time of the filing of the Complaint Powerline Sand was a Florida corporation with its principal place of business located in Duval County, Florida. *See* Complaint at ¶ 2.

8.      Removal is proper because there is complete diversity of citizenship between Powerline Sand and Hornblower.  *See* 28 U.S.C. §§ 1332, 1441 and 1446.

## 2.      The amount in controversy requirement is satisfied.

9.      Removal of this action is proper because the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  28 U.S.C. § 1332(a).

10.      In the Complaint, Plaintiffs allege that the amount in controversy exceeds Fifteen Thousand Dollars ($15,000.00), the state court jurisdictional threshold for circuit court subject matter jurisdiction.  *See* Complaint at ¶¶ 1 and 13.  "Where...the plaintiff has not pled a specific amount of damages, the removing defendant must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional requirements."  Williams v. Best Buy, Inc., 269 F.3d 1316, 1319 (11th Cir. 2001).

11.      If it is not facially apparent from the complaint that the amount in controversy exceeds the jurisdictional requirement, "the court should look to the notice of

---

[1]  "The mere fact that a corporation is doing business or is licensed to do business in a state does not make it a citizen of that state for purposes of diversity jurisdiction." Sanders Co. Plumbing and Heating, Inc. v. B.B. Const. Co. Inc., 660 F. Supp 752 (D. Kan. 1987).

removal and may require evidence relevant to the amount in controversy at the time the case was removed." Id.[2] The court "may consider facts in the removal petition and 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.' " Id, citing Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 949 (11th Cir. 2000) (quoting Singer v. State Farm Mut. Auto. Ins. Co., 116 F.3d 373, 377 (9th Cir. 1997). Furthermore, a post-suit letter from opposing counsel may serve as an "other paper" for purposes of the commencement of the thirty (30) day period to remove a case to federal court. See Addo v. Globe Life and Acc. Ins. Co., 230 F. 3d 759 (5th Cir. 2000)(noting that the majority of lower courts that have considered the issue of whether a post-complaint demand letter may serve as an "other paper" for removal purposes hold that such a letter is an "other paper" under § 1446(b)).

12.    As originally pled, Powerline Sand's Complaint was not sufficient to put Hornblower on notice that the amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs.

13.    Hornblower served discovery requests directed to the amount in controversy in this case on December 11, 2001. See Hornblower's Fist Interrogatories to Powerline Sand at Interrogatory No. 6.

---

[2] See also DeAguilar v. Boeing Co., 11 F.3d 55, 57 (5th Circuit 1993) (where the complaint contains no specific allegations of damages, the court will consider the allegations in the notice of removal); Lewis v. AT&T Corp., 898 F.Supp 907, 909 (S.D. Fla. 1995) (denying motion to remand where defendant's notice of removal supplied facts sufficient to demonstrate the jurisdictional minimum was satisfied); 14A Wright, Miller & Cooper, Federal Practice & Procedure, §3734 (West 1985) (should a court follow a strict interpretation of the rule concerning the amount stated in the complaint, the defendant's statutory right to removal would be wholly contingent upon the plaintiff's choice of words and such a rule would be an undesirable one.)

14.     Powerline Sand's interrogatory responses, which were served on January 16, 2002, did not identify the amount in controversy in this case but rather merely indicated that Powerline Sand's damages were continuing and that an estimation of thoe damages had not been made.   *See* Powerline Sand's Interrogatory Responses at Interrogatory No. 6.

15.     On August 27, 2002 Hornblower, through counsel, was served with a copy of a report prepared by Mr. Conrad Weihnacht, an expert witness retained by Powerline Sand in this case, a copy of which is attached hereto as Exhibit B in which Powerline Sand's damages were estimated as $541,384.25.   The August 27, 2002 letter with attached report was the first paper served on Hornblower which put Hornblower on notice that the amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs.

16.     Based on Powerline Sand's own expert witness' calculation of Powerline Sand's damages in this case, Hornblower has established by a preponderance of the evidence that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

17.     Because Hornblower was not put on notice that the damages sought by Powerline Sand in this case exceed $75,000.00 until August 27, 2002, this Notice of Removal is timely filed.   *See* Honeycutt v. Dillard's, Inc., 989 F. Supp. 1375 (D. Kan. 1997)(holding removal appropriate where removal was effected within 30 days of receipt of the plaintiff's statement of damages which disclosed the plaintiff's damages as $582,000.00 notwithstanding that the notice of removal was filed more than thirty days

after the defendant was served where the complaint merely pled an amount in controversy in excess of $15,000.00).

### 3.    Conclusion

18.    Removal of this action is proper pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Hornblower and Powerline Sand and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

### III.    ALL PREREQUISITES TO REMOVAL HAVE BEEN SATISFIED

19.    Plaintiffs brought their Circuit Court action in Duval County, Florida. Venue is thus proper in the Jacksonville Division of the United States District Court for the Middle District of Florida. 28 U.S.C. § 1446(a).

20.    As set forth above, Hornblower has timely filed this Notice of Removal within one year of the filing of the Complaint. See 28 U.S.C. § 1446(b). In addition, Hornblower has timely filed this Notice of Removal within thirty days of the service on Hornblower of the first "other paper" served on Hornblower demonstrating that the amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs.

21.    A copy of this Notice of Removal has been filed with the Circuit Court of the Fourth Judicial Circuit, in and for Duval County, Florida and written notice of the filing of this Notice of Removal has been given to all parties in this action, pursuant to 28 U.S.C. § 1446(d).

22.    Hornblower certifies that this Notice of Removal is signed pursuant to Rule 11, Fed. R. Civ. P., and in accordance with 28 U.S.C. § 1446(a). In addition, as set

forth above, copies of all pleadings, process, orders, and other papers filed in the State Court action are attached as composite Exhibit "A", as required by 28 U.S.C. § 1446(a).

23. Based on the foregoing, Hornblower has met its burden of establishing that this Court has original jurisdiction over the civil action pursuant to 28 U.S.C. § 1332(a) and that this action may be removed to this Court pursuant to 28 U.S.C. § 1441, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

24. If any questions arise as to propriety of the removal of this action, Hornblower respectfully requests the opportunity to present a brief oral argument in support of its position that this case is removable.

### IV. CONCLUSION

WHEREFORE, based on the foregoing, Hornblower hereby removes this action now pending in the Circuit Court of the Fourth Judicial Circuit, in and for Duval County, Florida, Case No. 2001-06957 CA, Division CV-D, to the United States District Court for the Middle District of Florida, Jacksonville Division pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

ROBERT B. PARRISH, ESQ.
Florida Bar # 268739
ERIC L. HEARN
Florida Bar No. 0094269
501 W. Bay Street
Jacksonville, Florida 32202
(904) 356-1306
(904) 354-0194-Facsimile

**Attorneys for Hornblower Marine Services, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Removal has been furnished by Hand Delivery on this 26th day of September 2002, to the following counsel of record:

John A. Tucker, Esq.
Foley & Lardner
The Greenleaf Building
200 Laura Street
Jacksonville, Florida 32202-3510
**Attorneys for Plaintiff Powerline Sand, Inc.**

Eric L. Hearn, Attorney

Form 1.997

## Civil Cover Sheet

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075.

**L.    CASE STYLE**

(Name of Court)    Circuit Court
Duval County

Plaintiff

POWERLINE SAND
INC., A FLORIDA
CORPORATION

Case #: 01-06957 CA

Judge

## DIVISION CV-D

vs.

Defendant

HORNBLOWER MARINE
SERVICES, INC.,
A CALIFORNIA CORPORATION

**II.    TYPE OF CASE**    (Place an x in one box only.  If the case fits more than one type of case, select the most definite.)

| Domestic Relations | Torts | Other Civil |
|---|---|---|
| ☐ Simplified dissolution | ☐ Professional Malpractice | ☐ Contracts |
| ☐ Dissolution | ☐ Products liability | ☐ Condominium |
| ☐ Support-IV-D | ☐ Auto negligence | ☐ Real property/ Mortgage foreclosure |
| ☐ URESA-IV-D | ☐ Other negligence | |
| ☐ URESA- Non IV-D | | ☐ Eminent domain |
| ☐ Domestic violence | | ☒ Other |
| ☐ Other domestic relations | | |
| ☐ Repeat Violence | | |

**III.    Is Jury Trial Demanded in Complaint?**

☐ Yes
☒ No

Date 10/8/01

Signature of Attorney for Party Initiating Action

**JIM FULLER**

Clerk of the Circuit Court

JON TAYLOR & ASSOCIATES, INC

Ronald E. Taylor                    Post Office Box 37766                    Telephone
  President                      Jacksonville, Florida 32236-7766          (904) 399-1224

---

POWERLINE SAND, INC., ETC.        VS. HORNBLOWER MARINE
                                       SERVICES, INC.                       01-06957-CA

---

   (Plaintiff)         VS        (Defendant)                            (Case #)

SUMMONS, COMPLAINT

---

  (Type of Process)              Date & Time:          REC 10-23-01 AT 3 PM
COUNTY                           CV-D

---

    (Court)                      (Division)

  Attorney:                   Servee:  HORNBLOWER MARINE SERVICES, INC.
  TUCKER, JOHN A.             Address: 4610 OCEAN ST.
  FOLEY & LARDNER                      JAX, FL
  200 LAURA STREET
  JACKSONVILLE , FL  32202-0000

    RECEIVED THIS PROCESS ON  OCT 23, 2001 AND SERVED THE SAME ON
    HORNBLOWER MARINE SERVICES, INC. CORPORATION THE WITHIN NAMED AT 09:30 AM
    ON  OCT 30, 2001 A.D., IN DUVAL COUNTY, FLORIDA

CORPORATION :
          BY DELIVERING A TRUE COPY OF THIS PROCESS WITH THE DATE AND HOUR
          OF SERVICE ENDORSED BY ME AND A COPY OF THE:
          SUMMONS, COMPLAINT

          TO: STEVE MORT, AS REGISTERED AGENT
          OF SAID DEFENDANT CORPORATION

          (AS DEFINED IN F.S. 48.091).

   OTHER :

   SERVICE FEE: $20.00                           RKG     OCT 30, 2001

---

                                           Control #  14655

                                      PATRICK HACKETT

---

SPECIAL PROCESS SERVER DULY APPOINTED AND QUALIFIED PURSUANT TO F.S.48.021(2)

IN THE COUNTY COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL COUNTY,
FLORIDA

POWERLINE SAND, INC.,
  a Florida corporation

          Plaintiffs,

01 - 06957 CA

vs.

                        Case No.

HORNBLOWER MARINE SERVICES, INC.,
  a California corporation,

                        Division

          Defendant.

_____/

**SUMMONS**

THIS
INSTRUMENT
IN
COMPUTER
**VALARIE**

THE STATE OF FLORIDA:

To all and singular the sheriffs of the State:

        **YOU ARE COMMANDED** to serve this summons and a copy of the complaint or petition in this action

on the defendant(s):

HORNBLOWER MARINE SERVICES, INC.
a California corporation
Teresa Amereihn, as Registered Agent
4610 Ocean Street
Mayport, FL 32233

        Each defendant is required to serve written defenses to the complaint or petition on plaintiff's attorney,

whose name and address is John A. Tucker, Esq., Foley & Lardner, 200 Laura Street, Post Office Box 240,

Jacksonville, Florida 32201-0240, telephone: (904) 359-2000, facsimile: (904) 359-8700, within 20 days after

service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses

with the clerk of this court either before service on plaintiff's attorney or immediately thereafter.  If a defendant fails

to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

        WITNESS my hand and the seal of this Court on   OCT 1 8 2001  .

Clerk Circuit Court

By: _____
       Deputy Clerk

4.277807.1

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.

    Plaintiff

v.

HORNBLOWER MARINE SERVICES,
INC.,

    Defendant.

CASE NO. 01-06957 CA

DIVISION CV-D

FILED

DEC 1 1 2001

_____/

## DEFENDANT HORNBLOWER MARINE SERVICES' NOTICE OF PROPOUNDING FIRST SET OF INTERROGATORIES TO PLAINTIFF POWERLINE SAND

COMES NOW the Defendant Hornblower Marine Services, Inc., by and through its undersigned counsel, and gives notice of the propounding of Hornblower Marine Services, Inc.'s First Set of Interrogatories (Numbered 1 through 6) to Plaintiff Powerline Sand, Inc. to be answered in writing and under oath as provided by the Florida Rules of Civil Procedure.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail to John A. Tucker, Esq., Foley & Lardner, P.O. Box 240, Jacksonville, Florida 32201-0240, counsel for Plaintiff Powerline Sand by U.S. Mail this _11_ day of December, 2001.

**MOSELEY, WARREN, PRICHARD & PARRISH**

Eric L. Hearn
Florida Bar No.: 0094269
501 West Bay Street
Jacksonville, Florida 32202
(904) 356-1306; 354-0194 (facsimile)
Attorneys for Defendant Hornblower Marine Services, Inc.

IN THE CIRCUIT COURT, FOURTH JUDICIAL CIRCUIT, IN AND FOR DUVAL COUNTY, FLORIDA

POWERLINE SAND, INC.

     Plaintiff

v.

HORNBLOWER MARINE SERVICES, INC.,

     Defendant.

_____/

CASE NO. 01-06957 CA

DIVISION CV-D

FILED

DEC 1 1 2001

CLERK CIRCUIT COURT

## DEFENDANT HORNBLOWER MARINE SERVICES, INC.'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFF POWERLINE SAND, INC.

Pursuant to Fla. R. Civ. P. 1.350, Defendant HORNBLOWER MARINE SERVICES, INC. requests that the Plaintiff POWERLINE SAND, INC. produce the following documents at the office of Moseley, Warren, Prichard & Parrish, P.A., 501 W. Bay Street, Jacksonville, Florida 32202 within thirty (30) days after the date of service hereof on the Plaintiff.

1.     Produce any written communication, including any documents relating to, summarizing, embodying, memorializing or otherwise concerning any such communications, between Plaintiff POWERLINE SAND, its agents or employees, and ˜ ˜dant HORNBLOWER MARINE SERVICES, its agents or employees, concerning t'

of trucks operated by Plaintiff POWERLINE SAND in connection ˙

Expressway Project (as referred to in Paragraph 5 of the Complair

Project (as referred to in Paragraph 5 of the Complaint)

Mayport Ferry.

2.    Produce any written communications, including any documents relating to, summarizing, embodying, memorializing or otherwise concerning any such communications, between Plaintiff POWERLINE SAND, its agents or employees, and any representative of the City of Jacksonville, Florida concerning the transportation of the trucks operated by Plaintiff POWERLINE SAND in connection with the Wonderwood Expressway Project (as referred to in Paragraph 5 of the Complaint) and/or the Atlantic Marine Project (as referred to in Paragraph 5 of the Complaint) over the St. Johns River via the Mayport Ferry.

3.    Produce any written communication, including any documents relating to, summarizing, embodying, memorializing or otherwise concerning any such communications, between Plaintiff POWERLINE SAND, its agents or employees, and any representative of the Florida Department of Transportation concerning the transportation of the trucks operated by Plaintiff POWERLINE SAND in connection with the Wonderwood Expressway Project (as referred to in Paragraph 5 of the Complaint) and/or the Atlantic Marine Project (as referred to in Paragraph 5 of the Complaint) over the St. Johns River via the Mayport Ferry.

4.    Produce any written communication, including any documents relating to, summarizing, embodying, memorializing or otherwise concerning any such communications, between Plaintiff POWERLINE SAND, its agents or employees, and any representative of the United States Coast Guard concerning the transportation of the trucks operated by Plaintiff POWERLINE SAND in connection with the Wonderwood Expressway Project (as referred to in Paragraph 5 of the Complaint) and/or the Atlantic Marine Project (as referred to in Paragraph 5 of the Complaint) over the St. Johns River via the Mayport Ferry.

5.    Produce any written communication, including any documents relating to, summarizing, embodying, memorializing or otherwise concerning any such communications, between Plaintiff POWERLINE SAND, its agents or employees, and any representative of the Jacksonville Transportation Authority concerning the transportation of the trucks operated by Plaintiff POWERLINE SAND in connection with the Wonderwood Expressway Project (as referred to in Paragraph 5 of the Complaint) and/or the Atlantic Marine Project (as referred to in Paragraph 5 of the Complaint) over the St. Johns River via the Mayport Ferry.

6.    Produce any notes, memoranda, correspondence, worksheets, calculations, proposals, bid sheets, or other documents prepared in connection with or otherwise relating to the proposal submitted by Plaintiff POWERLINE SAND to Atlantic Marine, Inc. for Plaintiff POWERLINE SAND to remove fill material from the ship construction and repair facility owned by Atlantic Marine on Heckscher Drive, Duval County, Florida as referred to in Paragraph 5 of the Complaint filed herein on behalf of POWERLINE SAND.

7.    Produce a copy of the contract between Plaintiff POWERLINE SAND and Atlantic Marine, Inc. for Plaintiff POWERLINE SAND to remove fill material from the ship construction and repair facility owned by Atlantic Marine on Heckscher Drive, Duval County, Florida as referred to in Paragraph 5 of the Complaint filed herein on behalf of POWERLINE SAND.

8.    Produce any notes, memoranda, correspondence, worksheets, bid sheets, calculations, proposals, or other documents prepared in connection with or otherwise relating to the Plaintiff POWERLINE SAND, INC.'s bid for Plaintiff POWERLINE SAND to supply fill

material in connection with the Wonderwood Expressway Project as referred to in Paragraph 5 of the Complaint filed herein on behalf of Plaintiff POWERLINE SAND.

9.     Produce a copy of the contract between Plaintiff POWERLINE SAND and the party with whom POWERLINE SAND contracted for Plaintiff POWERLINE SAND to provide fill material in connection with the Wonderwood Expressway Project as referred to in Paragraph 5 of the Complaint filed herein on behalf of Plaintiff POWERLINE SAND.

10.     Produce any documents identified in Powerline Sand, Inc.'s responses to the Defendant Hornblower Marine Services, Inc.'s First Set of Interrogatories to Plaintiff POWERLINE SAND.

11.     Produce any documents referred to by POWERLINE SAND, its agents or employees, in connection with the preparation of POWERLINE SAND's responses to Defendant HORNBLOWER MARINE SERVICES' First Set of Interrogatories to Plaintiff POWERLINE SAND.

MOSELEY, WARREN, PRICHARD & PARRISH

Eric L. Hearn
Florida Bar No. 0094269
501 W. Bay Street
Jacksonville, Florida 32202
Phone (904) 356-1306
Fax     (904) 354-0194

Attorneys for Defendant Hornblower Marine Services, Inc.

4

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served on

John A. Tucker, Esq., Foley & Lardner, P.O. Box 240, Jacksonville, Florida 32201-0240, counsel

for Plaintiff Powerline Sand by U.S. Mail this 11 day of December, 2001.

Eric L. Hearn, Attorney

5

IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

        Plaintiff,

vs.                              Case No. 01-06957 CA

HORNBLOWER MARINE SERVICES,      Division CV-D
INC.,

        Defendant.

_____/

**FILED**

**JAN 1 4 2002**

CLERK CIRCUIT COURT

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST REQUEST FOR PRODUCTION

Pursuant to Fla. R. Civ. P. 1.350, Plaintiff, Powerline Sand, Inc. ("Powerline"), responds to the respectively numbered requests for production of documents served by Defendant, Hornblower Marine Services, Inc. ("Hornblower") dated December 11, 2001, as follows:

1.     To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

2.     To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

3.     None known to exist at this time.

4.     None known to exist at this time.

5.     None known to exist at this time.

6.     To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

7.     To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

299013.1

8.    .To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

9.     To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

10.     To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

11.     To the extent such documents exist, such will be produced at the offices of Plaintiff's attorney at a mutually agreeable date and time.

_____
John A. Tucker,
Florida Bar No. 0356123
Foley & Lardner
The Greenleaf Building
200 Laura Street
Jacksonville, Florida  32202-3510
Telephone:  904.359.2000
Facsimile:  904.359.8700

Attorneys for Plaintiff, POWERLINE SAND, INC.

2

.299013.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to

the following by U.S. mail, first-class postage prepaid on January 11, 2002.

Eric L. Hearn
Moseley, Warren, Prichard & Parrish
501 W. Bay Street
Jacksonville, FL  32202

John A. Tucker

3

004.299013.1

IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

       Plaintiff,

vs.                                    Case No. 01-06957 CA

HORNBLOWER MARINE SERVICES,      Division CV-D
INC.,

       Defendant.

_____/

## NOTICE OF SERVING RESPONSES TO FIRST INTERROGATORIES

Pursuant to Florida Rule of Civil Procedure 1.340(e), Plaintiff gives notice that its

Answers to Defendant's First Set of Interrogatories, were served by U.S. Mail, postage prepaid,

on the 16 day of January, 2002, to Eric L. Hearn, Moseley, Warren, Prichard & Parrish, 501

West Bay Street, Jacksonville, FL 32202.



                               John A. Tucker,
                               Florida Bar No. 0356123
                               Foley & Lardner
                               200 Laura Street
                               Jacksonville, Florida 32202-3510
                               Telephone: 904.359.2000
                               Facsimile: 904.359.8700

                               Attorneys for Plaintiff, POWERLINE SAND,
                               INC.

POWERLINE SAND, INC.

    Plaintiff

v.

HORNBLOWER   MARINE   SERVICES,
INC.,

    Defendant.

_____/

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR DUVAL
COUNTY, FLORIDA

CASE NO. 01-06957 CA

DIVISION  CV-D

F I L E D

MAY 2 1 2002

_Jim Fuller_
CLERK CIRCUIT COURT

## DEFENDANT HORNBLOWER MARINE SERVICES, INC.'S NOTICE OF FILING OF PLAINTIFF POWERLINE SAND, INC.'S INTERROGATORY RESPONSES

COMES NOW the Defendant Hornblower Marine Services, Inc., by and through its undersigned counsel, and gives notice of the filing of Powerline Sand, Inc.'s Responses to Hornblower Marine Services, Inc.'s First Set of Interrogatories (Numbered 1 through 6) to Plaintiff Powerline Sand, Inc.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to John A. Tucker, Esq., Foley & Lardner, P.O. Box 240, Jacksonville, Florida 32201-0240, counsel for Plaintiff Powerline Sand by U.S. Mail this 20 day of May, 2001.

**MOSELEY, WARREN, PRICHARD & PARRISH**

Eric L. Hearn
Florida Bar No.: 0094269
501 West Bay Street
Jacksonville, Florida  32202
(904) 356-1306; 354-0194 (facsimile)
Attorneys for Defendant Hornblower Marine Services, Inc.



IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.                      CASE NO. 01-06957 CA

     Plaintiff                          DIVISION CV-D

v.

HORNBLOWER   MARINE   SERVICES,
INC.,

     Defendant.

_____/

## DEFENDANT HORNBLOWER MARINE SERVICES, INC.'S FIRST SET OF
## INTERROGATORIES TO PLAINTIFF POWERLINE SAND, INC.

Pursuant to Fla. R. Civ. P. 1.340, Defendant HORNBLOWER MARINE SERVICES,

INC. propounds the following Interrogatories on Plaintiff POWERLINE SAND, INC. to be

answered by the Plaintiff POWERLINE SAND, INC. in writing, under oath and a copy thereof

to be served upon Defendant HORNBLOWER MARINE SERVICES, INC.'s attorneys within

thirty (30) days after service hereof.

### Definitions and Instructions

Unless expressly negated by the context of the Interrogatory, the following definitions are
to be applicable to all Interrogatories contained herein:

1.      "Any" shall be understood to include and encompass "all".

2.      "Complaint" means the Complaint filed herein on behalf of Powerline Sand, Inc.
and against Hornblower Marine Services, Inc.

3.      "Document" means any kind of written or graphic matter, however produced or
reproduced, of any kind or description, whether sent or received or neither, including originals,
copies and drafts and both sides thereof, and including but not limited to all other records kept by
computerized, electronic, photographic, xerographic or mechanical means, and things similar to
any of the foregoing however denominated.

4.    .The term "Identify" of "identify" when used in reference to a corporation, company, entity, institution or governmental agency means:

      (a)    To state its full name, present address and telephone numbers;

      (b)    Any fictitious names under which it operates; and

      (c)    The present owners, officers and directors thereof with their current addresses.

5.    The term "Identify" or "identify" when used in reference to any individual means;

      (a)    To state his/her full name;

      (b)    Present or last known residence address;

      (c)    Present or last known business addresss;

      (d)    Present or last known employer;

      (e)    Whether ever employed by any party to this action, and, if so, the dates he/she was employed by such party and the last position held as an employee of such party.

6.    The term "Identify" or "identify" when used with reference to documents means to give the date, title, author and addressee. "Identify" or "identify" with respect to documents further means:

      (a)    To describe a document sufficiently well to enable interrogator to know what such document is and to retrieve it from a file or wherever it may be located;

      (b)    To desribe it in a manner suitable for use as a description in a subpoena;

      (c)    To give the name, address, position or title of the person(s) who has custody of the document and/or copies thereof.

7.    The term "identify" when used in reference to any oral communication means to give the date and participants in such communication and to describe the matters discussed during such communication.   The term "identify" when used in reference to any written communication means to identify such written communication in the same manner as that described in Instruction No. 6 above for documents generally.

8.    Whenever a date, amount, or other computation or figure is requested, the exact date, amount or other computation or figure is to be given unless it is not known; then, the approximate date, amount or other computation or figure should be given or the best estimate

thereof; and the answer shall state that the date, amount or other computation or figure is an estimate or approximation.

9.      No answer is to be left blank.  If the answer to an Interrogatory or subparagraph of an Interrogatory is "none" or "unknown", such statement must be written in the answer.  If an answer is omitted because of the claim of privilege, the basis or privilege is to be stated.

10.      The term "person" includes any individual, corporation, partnership, sole proprietorship, company, entity, subsidiary, business operation, municipality or governmental agency.

11.      The term "you" means Plaintiff Powerline Sand, Inc., its agents or employees, as applicable.

## **INTERROGATORIES**

1.      Please state the name, title and business address of all persons furnishing information in connection with, or otherwise participating in, the preparation of responses to these interrogatories stating as to each such person the interrogatory or interrogatories for which such person furnished information in connection with, or otherwise participated in the preparation of responses to, and the information furnished with respect thereto.

ANSWER:

See attached

4

2.    Identify all communications, whether oral or written, between POWERLINE SAND, its agents or employees, and any representative of HORNBLOWER MARINE SERVICES at any time concerning the matters described in the Complaint filed herein on behalf of POWERLINE SAND.

ANSWER:        see attached

3.    ʾIdentify all communications, whether oral or written, between POWERLINE SAND, its agents or employees, and any representative of the City of Jacksonville, the State of Florida Department of Transportation, the Jacksonville Transportation Authority or the United States Coast Guard, or any of them, at any time concerning or relating in any way to any inquiry made by or on behalf of POWERLINE SAND to determine whether trucks operated by POWERLINE SAND in connection with the Wonderwood Project (as referred to in Paragraph 5 of the Complaint) or the Atlantic Marine contract (as referred to in Paragraph 5 of the Complaint) would be permitted to cross the St. Johns River via the Mayport Ferry.   For each such communication identify the person or persons involved, the date of such communication, whether such communication was oral or written and the matters discussed during such communication.

ANSWER:

see attached

4.    ·Identify all persons involved directly or indirectly on behalf of POWERLINE SAND in connection with the preparation or POWERLINE SAND's bid to Atlantic Marine, Inc. with respect to the removal of fill material from Atlantic Marine, Inc.'s ship construction and repair facility on Heckscher Drive, Jacksonville, Florida as described in Paragraph 5 of the Complaint filed herein on behalf of POWERLINE SAND.

ANSWER:        see attached

5.      ˙Identify all persons involved directly or indirectly on behalf of POWERLINE

SAND in connection with the preparation of POWERLINE SAND's bid to supply fill material in

connection with the Wonderwood Expressway Project as referred to in Paragraph 5 of the

Complaint filed herein on behalf of POWERLINE SAND.

ANSWER:
    see attached

6.   State with specificity the amount of any damages suffered by Plaintiff POWERLINE SAND as a consequence of the reliance by Plaintiff POWERLINE SAND on the alleged representations made by Defendant HORNBLOWER MARINE SERVICES as referred to in Paragraph 8 of the Complaint filed herein on behalf of Plaintiff POWERLINE SAND. Please include in such statement of damages an itemization of each component category of damages (e.g. additional storage costs, additional transporation costs, etc.) allegedly suffered by Plaintiff POWERLINE SAND and the method utilized by Plaintiff POWERLINE SAND to calculate the amount of such damages.

ANSWER:        see attached

STATE OF FLORIDA

COUNTY OF DUVAL

BEFORE ME, the undersigned authority, this day personally appeared *Hennie de Beer*, who being first duly sworn, deposes and says:

My name is *Hennie de Beer*, and I am the *President* of Plaintiff POWERLINE SAND in the above matter, that I am authorized to make the representations herein stated on behalf of the Plaintiff POWERLINE SAND and the attached Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

POWERLINE SAND, INC.

By: _____

Sworn to and subscribed before me this _16_ day of *January*, 2001.

_____
Notary Public, State of Florida at Large

TYPED OR PRINTED NAME
OF NOTARY

My Commission Expires:

Affiant is <u>personally known</u> to me or has been identified by exhibition of I.D.: _____.



TERRY L. DEASON
MY COMMISSION # DD 044063
EXPIRES: September 9, 2005
Bonded Thru Notary Public Underwriters

## POWERLINE'S RESPONSES TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

1.    Hennie DeBeer, President, all interrogatories.

2.    Powerline, through its President, Hennie DeBeer, contacted the Defendant Hornblower, through its authorized employees Stephan A. Mort, General Manager and Jamie Wiltsy, Office Manager, and specifically advised that it was considering entering into contracts with Martin K. Eby Construction Co., Inc. and Atlantic Dry Dock Marine to supply and remove dirt, respectively, and that it would do so and the contract terms would depend upon whether its dump trucks could use the ferry for transport across the river, and wanted to confirm that its dump trucks could use the ferry to cross the St. Johns River.   The Defendant's employee represented to Powerline that such vehicles could use the ferry, stating further that if Powerline's trucks were one of the permitted vehicles listed on the posted sign, the ferry would transport them.   Upon further inquiry by Powerline, the Defendant's employee further represented to Powerline that there was no limit to the number of Powerline dump trucks using the ferry, that the ferry was on a first come first serve basis, and if the number of vehicles waiting to use the ferry (including Powerline's vehicles and others) was large, a second ferry would also be used. Thereafter, Mr. Mort wrote Mr. DeBeer a letter dated June 21, 2001, telling him that Powerline's trucks could not use the ferry.   Mr. DeBeer later spoke with Mr. Mort who stated Powerline could not use the ferry because some important person had complained about having the trucks on the ferry and he didn't want to be in that position again, and that the ferry was not designed to carry the trucks.

3.    None known at this time with regard to the State of Florida Department of Transportation, the Jacksonville Transportation Authority, and United States Coast Guard.  As to the City of Jacksonville, see documents produced.

1

4.    .' Hennie DeBeer.

5.    Hennie DeBeer.

6.    Powerline is still determining these damages. However, at this time, Powerline can state that its damages are believed to include the following. Based upon the representations of Defendant, Powerline entered into a contract with Martin K. Eby Construction Co., Inc. to provide fill dirt and limerock for a stated fee. Powerline similarly entered into a contract with Atlantic Dry Dock Marine to remove certain dirt from its premises. Powerline's plan (and contracts) were based upon the representation of Defendant that its trucks could use the ferry to transport the dirt from the Atlantic Marine site on the north side of the St. Johns River, to the Eby Construction site on the south side of the river. When Defendant barred Powerline's trucks from the ferry, Powerline had to obtain alternative dirt sources, and attempt to locate alternative fill locations for the dirt at the Atlantic Marine site. The Eby Construction job is not completed, and thus Powerline has not determined the extent of the additional costs it has and will incur. Also, Powerline is still determining what uses will be made of the dirt at the Atlantic Marine site and until this is finalized, cannot determine the extra costs this will cause.

2

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

POWERLINE SAND, INC., a Florida )   Case No. 2001-06957 CA
Corporation,
                                 )   Division CV-D

            Plaintiff,           )

v.                               )

HORNBLOWER MARINE
SERVICES, INC., a California corporation, )

            Defendant.           )

_____/

## DEFENDANT HORNBLOWER MARINE SERVICES, INC.'S NOTICE OF SERVICE OF PROPOSAL FOR SETTLEMENT ON PLAINTIFF POWERLINE SAND, INC.

COMES NOW Defendant HORNBLOWER MARINE SERVICES, INC., by and through its undersigned counsel, and gives notice of the service of a Proposal for Settlement, made pursuant to Section 768.79, Fla. Stat., and Rule 1.442, Fla. R. Civ. P., on the Plaintiff Powerline Sand, Inc. by U.S. Mail this 29th day of July, 2002.

Robert B. Parrish
Florida Bar No. 268739
Eric L. Hearn
Florida Bar No. 0094269
Moseley, Warren, Prichard & Parrish, P.A.
501 W. Bay Street
Jacksonville, Florida 32202
Phone: (904) 356-1306
Fax:   (904) 354-0194

Counsel for Defendant Hornblower Marine Services, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served on John A. Tucker, Esq., Foley & Lardner, 200 Laura Street, Post Office Box 240, Jacksonville, Florida 32201-0240 by U.S. Mail this ___29___ day of July, 2002.

Eric L. Hearn, Attorney



IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

      Plaintiff,

vs.                         Case No. 01-06957 CA

HORNBLOWER MARINE SERVICES, INC.,   Division CV-D

      Defendant.

_____/

### PLAINTIFF'S NOTICE OF PROPOUNDING
### FIRST INTERROGATORIES TO DEFENDANT

    I HEREBY CERTIFY that the original and one copy of Plaintiff's First
Interrogatories to Defendant, along with a copy of this notice, have been furnished by hand
delivery this 27th day of August, 2002 to the attorney for the Defendant, Eric L. Hearn,
Moseley, Warren, Pritchard & Parrish, 501 West Bay Street, Jacksonville, FL 32202.

                        FOLEY & LARDNER

                        _____
                        John A Tucker, Esquire
                        Florida Bar No. 356123
                        200 Laura Street
                        Jacksonville, FL 32202
                        Telephone:  (904) 633-8924
                        Telefax:  (904) 359-8700
                        Attorneys for Plaintiff

THIS INSTRUMENT
IN COMPUTER
D. D.

FILED
AUG 2 7 2002

CLERK CIRCUIT COURT

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

to the attorney for the Defendant, Eric L. Hearn, Moseley, Warren, Pritchard & Parrish, 501

West Bay Street, Jacksonville, FL 32202, by hand delivery, this 27th day of August, 2002.

John A. Tucker

004.333600.1



IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

      Plaintiff,

vs.                                  Case No. 01-06957 CA

HORNBLOWER MARINE SERVICES, INC.,    Division CV-D

      Defendant.

_____/

**FILED**

AUG 2 7 2002

CLERK CIRCUIT COURT

## PLAINTIFF'S NOTICE OF PROPOUNDING
## FIRST INTERROGATORIES TO DEFENDANT

I HEREBY CERTIFY that the original and one copy of Plaintiff's First Interrogatories to Defendant, along with a copy of this notice, have been furnished by hand delivery this 27th day of August, 2002 to the attorney for the Defendant, Eric L. Hearn, Moseley, Warren, Pritchard & Parrish, 501 West Bay Street, Jacksonville, FL 32202.

FOLEY & LARDNER

John A Tucker, Esquire
Florida Bar No. 356123
200 Laura Street
Jacksonville, FL 32202
Telephone: (904) 633-8924
Telefax: (904) 359-8700
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the attorney for the Defendant, Eric L. Hearn, Moseley, Warren, Pritchard & Parrish, 501 West Bay Street, Jacksonville, FL 32202, by hand delivery, this 27th day of August, 2002.

John A. Tucker



IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

      Plaintiff,

vs.                             Case No. 01-06957 CA

HORNBLOWER MARINE SERVICES, INC.,     Division CV-D    *FILED*

      Defendant.                              AUG 2 7 2002

_____/          CLERK CIRCUIT COURT

## NOTICE OF HEARING

      PLEASE TAKE NOTICE that on **Friday, September 27, 2002, at 3:00 p.m.** the undersigned shall call up before the Honorable L. Page Haddock, one of the Judges of the above-styled Court, Duval County Courthouse, Jacksonville, Florida, for Defendant Hornblower Marine Services, Inc.'s Motion to Dismiss.  Fifteen (15) minutes have been scheduled for this hearing.

      Please govern yourselves accordingly.

      *Individuals with disabilities needing a reasonable accommodation to participate in this proceeding should contact Foley & Lardner not later than seven (7) days prior to the proceeding at 200 Laura Street, Jacksonville, Florida 32202.  If notice to the individual of this hearing is less than seven (7) days, then the individual should contact Foley & Lardner as soon as possible after receiving this notice.  Telephone 904/359-2000; or if hearing impaired, 1-800-955-8771 (TDD); or 1-800-955-8770 (v), via Florida Relay Services.*

*All attorneys appearing at the Hearing shall be familiar with, and shall conduct themselves in accordance with, the guidelines for professional conduct of the trial lawyers section of the Florida Bar and the Jacksonville bar Association as well as the 1998 Handbook on discovery practice published by the Joint Committee of trial lawyers section of the Florida bar and Conferences of circuit and county court judges.*

FOLEY & LARDNER

John A Tucker, Esquire
Florida Bar No. 356123
200 Laura Street
Jacksonville, FL 32202
Telephone: (904) 633-8924
Telefax: (904) 359-8700
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

to the attorney for the Defendant, Eric L. Hearn, Moseley, Warren, Pritchard & Parrish, 501

West Bay Street, Jacksonville, FL 32202, by hand delivery, this 27TH day of August, 2002.

John A. Tucker

IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

        Plaintiff,

vs.

        Case No. 01-06957-CA

HORNBLOWER MARINE SERVICES, INC.,

        Division CV-D

        Defendant.

*FILED*

*AUG 2 7 2002*

*CLERK CIRCUIT COURT*

_____/

## PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Rule 1.350, Florida Rules of Civil Procedure, Plaintiff, Powerline Sand, Inc., hereby requests the Defendant, Hornblower Marine Services, Inc., to produce for inspection and copying within thirty (30) days of the date hereof, the following documents:

## DEFINITIONS

As used herein, the following definitions apply:

1.    "Document" or "documents" mean the original, or a copy where the original is not available, and each non-identical copy, including those which are non-identical by reason of notations or markings, of the following: papers, tapes (both audio and video), discs, or other substances on which communications, data or information is recorded or stored, whether made by manual, mechanical, photographic or electronic processes or means. This definition includes all drafts or superseded revisions of each document.

2. As used herein, the terms "document" or "documents" include but are not limited to the following: books, pamphlets, brochures, advertisements, marketing and advertisement literature, bulletins, directives, specifications, labels or labeling, periodicals, correspondence, memoranda, notes (including handwritten notes), notations, spread sheets, messages, telegrams, cables, drafts, diaries, calendars (including desk calendars or desk books), bills of lading, shipper's records, trucker's or carrier's records, delivery tickets, studies, analyses, trucker's or carrier's records, delivery tickets, studies, analyses, summaries, reports, minutes (including corporate minutes and minutes of committee or other meetings), contracts, agreements, invoices, bills, checks, photographs, quality control tests and results thereof, complaints, notices or orders from any governmental entity, subdivision or agency, and any

and all other written, printed, typed, punched, taped, filed or graphic matter or tangible thing, of whatever description, however produced or reproduced (including computer stores or generated data, together with instructions and any programs necessary to search or retrieve such data), and also include any and all tape recorded or videotaped communications or documents.

3.   "Plaintiff" means and refers to the Plaintiff, Powerline Sand, Inc., and any and all representatives, agents, or other parties working for or on behalf of the Plaintiff.

4.   "Defendants" means and refers to Defendants, Hornblower Marine Services, Inc., including any and all representatives, agents and personnel of Defendants.

5.   Unless otherwise defined herein, each word or term shall have the meaning ascribed to it in *Webster's Ninth New Collegiate Dictionary.*

6.   If, in response to any of the document requests, you claim that a document or documents are privileged, please state, with regard to each designated document, the following:

   a.   The type of privilege claimed (*e.g.* attorney/client, work product, trade secret, etc.);

   b.   The type of document involved (*e.g.* letter, report, etc.);

   c.   The author or authors of the document;

   d.   All recipients of the document;

   e.   The date of the document; and

   f.   The subject matter of, or addressed by, the document.


## REQUESTS FOR PRODUCTION

1.   Any and all letters or other documents of any type constituting or relating to any correspondence or communications by and between the Plaintiff and the Defendant (and/or their employees, agents and attorneys).

2.   Any and all letters or other documents of any type constituting or relating to any correspondence or communications between the Defendant and the City of Jacksonville (and/or

37.1

their employees, agents and attorneys) related in any way to the subject claim or limitations on the sizes, weights or otherwise for vehicles using the ferry.

3.    Any and all correspondence or other documents of any type constituting or relating to any correspondence or communications between the Defendant and the Florida Department of Transportation (or any other governmental entity or agency) (and/or their employees, agents and attorneys) related in any way to the subject claim or limitations on sizes, weights or otherwise for vehicles using the ferry.

4.    Any and all insurance policies which may provide coverage for the Plaintiff's claim herein.

5.    Any and all correspondence or other documents of any type relating to or constituting any correspondence or communications by and between the Defendant and any other person or entity (excluding defense counsel) related to any size, weight or other limitations for vehicles using the ferry, including but not limited to Plaintiff's vehicles.

6.    Any and all manuals or documents of any type which identify the carrying capacities and/or any size, weight or other limitations related to vehicles for each ferry used by Defendant at any time from 1995 to the present.

7.    Any and all documents identifying or related to any governmental statutes, rules and regulations related to the size, weight or other limitations on vehicles using ferry.

33637.1

8.    Any and all documents produced to, received from, created or reviewed by, any expert witness whom the Defendant intends to call to testify in the trial of this action.

FOLEY & LARDNER

John A. Tucker, Esquire
Florida Bar No.:  356123
Greenleaf Building
200 N. Laura Street
P.O. Box 240
Jacksonville, Florida  32201-0240
(904) 359-2000 (Telephone)
(904) 359-8700 (Facsimile)
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the attorney for the Defendant, Eric L. Hearn, Moseley, Warren, Pritchard & Parrish, 501 West Bay Street, Jacksonville, FL 32202, by hand delivery, this 27th day of August, 2002.

John A. Tucker

IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

        Plaintiff,

vs.

HORNBLOWER MARINE SERVICES, INC.,

        Defendant.

_____/

Case No. 01-06957 CA

Division CV-D



## PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Rule 1.350, Florida Rules of Civil Procedure, Plaintiff, Powerline Sand, Inc., hereby requests the Defendant, Hornblower Marine Services, Inc., to produce for inspection and copying within thirty (30) days of the date hereof, the following documents:

## DEFINITIONS

As used herein, the following definitions apply:

1.    "Document" or "documents" mean the original, or a copy where the original is not available, and each non-identical copy, including those which are non-identical by reason of notations or markings, of the following: papers, tapes (both audio and video), discs, or other substances on which communications, data or information is recorded or stored, whether made by manual, mechanical, photographic or electronic processes or means. This definition includes all drafts or superseded revisions of each document.

2.  As used herein, the terms "document" or "documents" include but are not limited to the following: books, pamphlets, brochures, advertisements, marketing and advertisement literature, bulletins, directives, specifications, labels or labeling, periodicals, correspondence, memoranda, notes (including handwritten notes), notations, spread sheets, messages, telegrams, cables, drafts, diaries, calendars (including desk calendars or desk books), bills of lading, shipper's records, trucker's or carrier's records, delivery tickets, studies, analyses, trucker's or carrier's records, delivery tickets, studies, analyses, summaries, reports, minutes (including corporate minutes and minutes of committee or other meetings), contracts, agreements, invoices, bills, checks, photographs, quality control tests and results thereof, complaints, notices or orders from any governmental entity, subdivision or agency, and any

and all other written, printed, typed, punched, taped, filed or graphic matter or tangible thing, of whatever description, however produced or reproduced (including computer stores or generated data, together with instructions and any programs necessary to search or retrieve such data), and also include any and all tape recorded or videotaped communications or documents.

3. "Plaintiff" means and refers to the Plaintiff, Powerline Sand, Inc., and any and all representatives, agents, or other parties working for or on behalf of the Plaintiff.

4. "Defendants" means and refers to Defendants, Hornblower Marine Services, Inc., including any and all representatives, agents and personnel of Defendants.

5. Unless otherwise defined herein, each word or term shall have the meaning ascribed to it in *Webster's Ninth New Collegiate Dictionary*.

6. If, in response to any of the document requests, you claim that a document or documents are privileged, please state, with regard to each designated document, the following:

   a. The type of privilege claimed (*e.g.* attorney/client, work product, trade secret, etc.);

   b. The type of document involved (*e.g.* letter, report, etc.);

   c. The author or authors of the document;

   d. All recipients of the document;

   e. The date of the document; and

   f. The subject matter of, or addressed by, the document.


## REQUESTS FOR PRODUCTION

1. Any and all letters or other documents of any type constituting or relating to any correspondence or communications by and between the Plaintiff and the Defendant (and/or their employees, agents and attorneys).

2. Any and all letters or other documents of any type constituting or relating to any correspondence or communications between the Defendant and the City of Jacksonville (and/or

333637.1

their employees, agents and attorneys) related in any way to the subject claim or limitations on the sizes, weights or otherwise for vehicles using the ferry.

3.     Any and all correspondence or other documents of any type constituting or relating to any correspondence or communications between the Defendant and the Florida Department of Transportation (or any other governmental entity or agency) (and/or their employees, agents and attorneys) related in any way to the subject claim or limitations on sizes, weights or otherwise for vehicles using the ferry.

4.     Any and all insurance policies which may provide coverage for the Plaintiff's claim herein.

5.     Any and all correspondence or other documents of any type relating to or constituting any correspondence or communications by and between the Defendant and any other person or entity (excluding defense counsel) related to any size, weight or other limitations for vehicles using the ferry, including but not limited to Plaintiff's vehicles.

6.     Any and all manuals or documents of any type which identify the carrying capacities and/or any size, weight or other limitations related to vehicles for each ferry used by Defendant at any time from 1995 to the present.

7.     Any and all documents identifying or related to any governmental statutes, rules and regulations related to the size, weight or other limitations on vehicles using ferry.

8.    Any and all documents produced to, received from, created or reviewed by, any expert witness whom the Defendant intends to call to testify in the trial of this action.

                                        FOLEY & LARDNER


                                        _____
                                        John A. Tucker, Esquire
                                        Florida Bar No.: 356123
                                        Greenleaf Building
                                        200 N. Laura Street
                                        P.O. Box 240
                                        Jacksonville, Florida 32201-0240
                                        (904) 359-2000 (Telephone)
                                        (904) 359-8700 (Facsimile)
                                        Attorneys for Plaintiff

                        **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the attorney for the Defendant, Eric L. Hearn, Moseley, Warren, Pritchard & Parrish, 501 West Bay Street, Jacksonville, FL 32202, by hand delivery, this 27th day of August, 2002.

                                        _____
                                        John A. Tucker



IN THE CIRCUIT COURT OF THE FOURTH
JUDICIAL CIRCUIT IN AND FOR DUVAL
COUNTY, FLORIDA

POWERLINE SAND, INC.,

     Plaintiff,

vs.

                                    Case No. 01-06957 CA

HORNBLOWER MARINE SERVICES, INC.,      Division CV-D    **F I L E D**

     Defendant.                         AUG 2 7 2002

_____/           CLERK CIRCUIT COURT

## NOTICE OF HEARING

     PLEASE TAKE NOTICE that on **Friday, September 27, 2002, at 3:00 p.m.** the undersigned shall call up before the Honorable L. Page Haddock, one of the Judges of the above-styled Court, Duval County Courthouse, Jacksonville, Florida, for Defendant Hornblower Marine Services, Inc.'s Motion to Dismiss. Fifteen (15) minutes have been scheduled for this hearing.

     Please govern yourselves accordingly.

        *Individuals with disabilities needing a reasonable accommodation to participate in this proceeding should contact Foley & Lardner not later than seven (7) days prior to the proceeding at 200 Laura Street, Jacksonville, Florida 32202. If notice to the individual of this hearing is less than seven (7) days, then the individual should contact Foley & Lardner as soon as possible after receiving this notice. Telephone 904/359-2000; or if hearing impaired, 1-800-955-8771 (TDD); or 1-800-955-8770 (v), via Florida Relay Services.*

BRUSSELS
CHICAGO
DENVER
DETROIT
JACKSONVILLE
LOS ANGELES
MADISON
MILWAUKEE
ORLANDO
SACRAMENTO
SAN DIEGO/DEL MAR
SAN FRANCISCO
TALLAHASSEE
TAMPA
WASHINGTON, D.C.
WEST PALM BEACH

# FOLEY:LARDNER
### ATTORNEYS AT LAW

August 27, 2002

Eric Hearn
Moseley, Warren, Pritchard & Parrish
501 West Bay Street
Jacksonville, FL 32202

Re:   <u>Powerline Sand v. Hornblower Marine</u>

Dear Eric:

As indicated in my prior correspondence, I have enclosed our expert, Conrad
Weihnacht's, report regarding the damages in this case.  As you will see, this report also includes
documents from the various Powerline files that he relied upon in compiling the claim.  Please
take a look at this and then let me know if this satisfies your discovery issues, or whether we
need to supplement our discovery responses further. Best wishes.

Sincerely,

John A. Tucker

JAT/avw
Enclosures

OLEY & LARDNER
HE GREENLEAF BUILDING
00 LAURA STREET
CKSONVILLE, FLORIDA  32202-3510
O. BOX 240
CKSONVILLE, FLORIDA  32201-0240

L: 904.359.2000
Y: 904.359.8700
W.FOLEYLARDNER.COM

EMAIL ADDRESS
jtucker@foleylaw.com

CLIENT/MATTER NUMBER
068929-0117

004.335488.1

# *Conrad Weihnacht*, CONSULTANT
### A DIVISION OF CWC, INC.

August 26, 2002

Foley & Lardner
200 Laura Street
Jacksonville, FL 32202-3510

Attn:  John Tucker

Re:   Powerline Sand, Inc. vs. Hornblower Marine Services, Inc.

Gentlemen,

As per your request, I have reviewed the documents provided by Powerline
Sand, Inc.  I have also met with Mr. DeBeer to obtain background information.

Enclosed herewith are the following:
1.      Log of Documentation
2.      Preliminary Draft of Background for the Claim
3.      Preliminary draft of Damages Suffered by Powerline Sand. (Table 1)
4.      Copies of Documents currently available. (Docs. #1 through #15)

Please advise if any additional information is desired.

Sincerely,

Conrad Weihnacht

Cc: Powerline Sand

August 26, 2002

Re: Powerline Sand, Inc. vs. Hornblower Marine Services, Inc.

## LOG OF DOCUMENTATION

| Doc. # | Date | From | To | Description |
|---|---|---|---|---|
| #1 | 4/12/01 | Old Dominion | ADDC | PSI Performance Bond to Atlantic Dry Dock Corporation. $500,000.00. |
| #2 | 4/17/01 | ADDC | PSI | Agreement regarding the removal of spoil material generated from ADDC's dredging operations in the St. Johns River. |
| | | | | On or before March 1, 2002, Powerline will remove all of the spoil material which is approximately 136,000 cy +/- from the leased premises. |
| | | | | All spoil material removed by Powerline must be used for public use on public land. |
| | | | | Powerline shall provide ADDC a performance bond. |
| #3 | 5/18/01 | EBY | PSI | Purchase order Contract No. 42113-014. $1,434,311.00 |
| | | | | No date. |
| #4 | St. Johns River Ferry sign. | | #5 | 4 axle (private/Commercial/RV)    $4.50 |
| | 8/16/01 | FDOT | | Weight Tables and Illustrations: |
| | | | | Maximum gross weight 70,000 pounds (for 4-axle truck) |
| | | | | Maximum Single-axle weight is 22,000 pounds |
| #6 | 12/13/01 | Jaxport | PSI | License and Use Agreement for Bucks Island Spoil Area Source of Borrow Material. |
| | | | | 11. "The fee shall be $0.25 per cubic yard leaving the island. |
| #7 | 3/18/02 | Nat. Grange Ins. | ADDC | The bond of Old Dominion Insurance remains in full force and effect. |
| #8 | 3/28/02 | ADDC | PSI | Extension Agreement. Because of unforeseen circumstances, Powerline will be unable to remove all the spoil material prior to the deadline imposed by the agreement. |

1. Deadline is extended to March 1, 2003.

2. The $500,000 Performance and Payment Bonds shall remain in force through March 1, 2003.

3. Powerline shall reimburse ADDC for the cost of the permanent irrigation system required by the Florida Inland Navigation District Lease Extension.

1

## LOG OF DOCUMENTATION

| Doc. # | Date | From | To | Description: |
|---|---|---|---|---|
| #9 | 4/24/02 | PSI | | Record of truckloads delivered to Wonderwood Expressway. 7,694 loads. |
| #10 | 2/26 to 3/4/02 | Ferry | | Ferry Tickets |
| #11 | 6/22/01 | C&A Trucking | PSI | Invoice for trucking |
| #12 | 2/27/02 | PSI | Atlantic Marine | Check for professional fees. |
| #13 | 7/5/01 | H. Oritz | PSI | Trucking costs. |
| #14 | 6/21/01 | Hornblower | PSI | Effective immediately, large dump trucks, full or empty, are prohibited from using the St. Johns River Ferry. This decision is based on deck load limitations provided by the naval Architect who designed the ferry. The deck was designed to carry vehicles weighing no more than 15,000# each. The weight of a large empty truck is a minimum of 25,000#, 10,000# over limit. |
| #15 | no date | PSI | | Original bid calculations. |

2

# *Conrad Weihnacht*, CONSULTANT

### A DIVISION OF CWC, INC.

August 26, 2002

Re:   Powerline Sand, Inc. vs. Hornblower Marine Services, Inc.

Background for the Claim:

1.      On May 18, 2001, Powerline Sand, Inc. (PSI) bid on furnishing the sand and other materials for Martin K. EBY Construction Co. Inc. (EBY), as required to construct the Wonderwood Connector project for the Jacksonville Transportation Authority.

2.      PSI based its bid to EBY on obtaining the required materials from dredge spoil owned by Atlantic Dry Dock Corporation (ADDC). (Doc. #2)

3.      PSI based its bid to EBY on transporting the materials required to be delivered to EBY on the Eastside of the Intercoastal waterway utilizing the St. Johns River Ferry on State Road A1A at Mayport.

4.      Prior to making its bid to EBY, PSI verified that the trucks which were to be used to transport the materials conformed to the Florida Department of Transportation (FDOT) weight restrictions (Doc. #5).

5.      Prior to making its bid to EBY, PSI verified that the Ferry would accept its loaded trucks. This verification was accomplished by the sign at the St. Johns River Ferry, which indicated that the toll for 4-axle (Private/Commercial/RV) vehicles was $4.00. (Doc. #4).

6.      Prior to making its bid to EBY, PSI verified that the Ferry would accept its loaded trucks. This verification was accomplished by a meeting with a Hornblower representative in March 2001.

7.      On April 17, 2001, PSI entered into an Agreement with ADDC for the removal of spoil material generated from ADDC's dredging operations in the St. Johns River.  The Agreement stated: "On or before March 1, 2002, Powerline will remove all of the spoil material which is approximately 136,000 cy +/- from the leased premises. All spoil material removed by Powerline must be used for public use on public land." (Doc. #2)

       PSI provided a Performance Bond to Atlantic Dry Dock Corporation in the amount of 500,000.00. ." (Doc. #1)

       On May 18, 2001, PSI entered into Purchase order Contract No. 42113-014 , with EBY the amount of $1,434,311.00, to provide specified amounts of sand and other gregates on both the east and the west side of the Intercoastal Waterway. (Doc. #3)

10.   PSI commenced the excavation, loading and transportation of the sand required by EBY on June 14, 2001.

11.   The trucks, loaded with sand utilized the St. Johns River Ferry on State Road A1A. There were no problems.

12.   The hauling cost, using the St. Johns River Ferry was $38.00 per load. (Doc. #11)

13.   On June 21, 2001, Stephan A. Mort, General Manager of Hornblower advised PSI by letter that: "Effective immediately, large dump trucks, full or empty, are prohibited from using the St. Johns River Ferry. This decision is based on deck load limitations provided by the naval Architect who designed the ferry. The deck was designed to carry vehicles weighing no more than 15,000# each. The weight of a large empty truck is a minimum of 25,000#., 10,000# over limit. (Doc. #14)

14.   The cost of trucking the sand from the ADDC spoil area to the Wonderwood Connector Jobsite was prohibitive. PSI arranged for a closer sand pit owned by Jaxport. On December 13, 1991, PSI and the Jacksonville Port Authority for a License and Use Agreement for Bucks Island Spoil Area Source of Borrow Material. The sand from this pit cost PSI $0.25 per cubic yard, or $5.00 per truckload. (Doc. #6)

15.   The hauling cost, not using the St. Johns River Ferry was $50.00 per load. (Doc. #13 )

16.   The hauling cost of the limerock, stabilization material, riprap, bedding stone and gabion stone required to be delivered to the Wonderwood Connector Jobsite, using the St. Johns River Ferry was $80.00 per load.

17.   PSI transported approximately 500 truckloads of sand in trucks operated by American Aggregates between February 26 and March 4, 2002, using the St. Johns River Ferry. (Doc. #10)

18.   PSI delivered a total of 7,694 truckloads of material to the Wonderwood Expressway site. (Doc. #9)

19.   PSI is still required to remove the remainder of the sand from the ADDC pit, approximately 85,000 CY, in accordance with the Agreement with ADDC and the performance bond. This material could not be used for the Wonderwood Connector project because of the excessive hauling costs due to the inability to use the St. Johns River Ferry.

20.   The extra cost to load the sand from the ADDC pit, to truck the sand to an alternate storage area and to rehandle the sand into stockpiles, is estimated at $3.50 per cy, or approximately $300,000.

21.   On March 28, 2002, PSI was obtained an extension to the Agreement with ADDC. The Extension Agreement provided for the extension of the deadline to March 1, 2003. The $500,000 Performance and Payment Bonds will remain in force through March 1, 2003. Powerline shall reimburse ADDC for the cost of the permanent irrigation system required by the Florida Inland Navigation District Lease Extension. (Doc. #8)

22.   The extra premium for the extension of the Performance Bond was $2,500. (Doc. #7 )

23.   The extra cost of legal services to prepare the Extension Agreement with ADDC was $3,000. (Doc. #12)

24.   The estimated direct costs incurred by PSI as a result of the denial by Hornblower of PSI's right to use the St. Johns River Ferry was $447,425.00. (Table 1)

25.   The claim of PSI as a result of the denial by Hornblower of PSI's right to use the St. Johns River Ferry is $541,384.25. (Table 1)

AUGUST 26, 2002        POWERLINE SAND, INC.        TABLE 1

VS.

HORNBLOWER MARINE SERVICES, INC.

## DAMAGES SUFFERED BY POWERLINE SAND

| | | AS-PLANNED | | AS-BUILT | | DAMAGES |
|---|---|---|---|---|---|---|
| 1 | Cost of Sand from new pit | | | | | |
| | 89,900 cy | $ - | $ - | $ 0.25 | $ 22,475.00 | $ 22,475.00 |
| 2 | Transportation of Sand | | | | | |
| | 4,495 loads @ | $ 40.00 | $ 179,800.00 | $ 50.00 | $ 224,750.00 | $ 44,950.00 |
| 3 | Transportation of Limerock, Riprap, Bedding Stone, & Gabion Stone | | | | | |
| | 1,425 loads @ | $ 40.00 | $ 57,000.00 | $ 80.00 | $ 114,000.00 | $ 57,000.00 |
| 4 | Removal and Storage of Sand from origional pit | | | | | |
| | 85,000 cy | $ - | $ - | $ 3.50 | $ 297,500.00 | $ 297,500.00 |
| 5 | Lease extension for original pit: 1 year. | | | | | |
| | Costs of irrigation | $ - | | | $ 20,000.00 | $ 20,000.00 |
| 6 | Other Damages | | | | | |
| | Bond Premium for extension | | | | | |
| | $ 500,000 @ | $ - | $ - | 0.50% | $ 2,500.00 | $ 2,500.00 |
| | Legal costs for extension | | | | $ 3,000.00 | $ 3,000.00 |
| 7 | Subtotal | | $ 236,800.00 | | $ 684,225.00 | $ 447,425.00 |
| 8 | Powerline overhead | 10% | | | | $ 44,742.50 |
| 9 | Subtotal | | | | | $ 492,167.50 |
| 10 | Powerline profit | 10% | | | | $ 49,216.75 |
| 11 | Total | | | | | $ 541,384.25 |

CW

03/18/02 10:58 FAX 1 803 358 1349      NGN BOND                                    ☑003/005

THE AMERICAN INSTITUTE OF ARCHITECTS



Premium Amount Based
on Final Contract Amount

Bond No. 9701384

AIA Document A312

# Performance Bond

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

CONTRACTOR (Name and Address):          SURETY (Name and Principal Place of Business):
POWERLINE SAND, INC.                    OLD DOMINION INSURANCE COMPANY
P.O. BOX 6821                           8428 BAYMEADOWS RD.
JACKSONVILLE, FL 32236                  JACKSONVILLE, FL 32256

OWNER (Name and Address):
ATLANTIC DRY DOCK CORPORATION
8500 HECKSCHER DR.
JACKSONVILLE, FL 32226

CONSTRUCTION CONTRACT
Date:    April 12th, 2001
Amount: $    500,000.00
Description (Name and Location):
Spoil Removal

BOND
Date (Not earlier than Construction Contract Date): April 12th, 2001
Amount: $    500,000.00
Modifications to this Bond:                    [X] None                    [ ] See Page 3

CONTRACTOR AS PRINCIPAL                         SURETY
COMPANY:              (Corporate Seal)          COMPANY:              (Corporate Seal)
POWERLINE SAND, INC.                            OLD DOMINION INSURANCE COMPANY

Signature:                                      Signature:
Name and Title: HENDRICK C. DEBEER, President   Name and Title: Judy E. West, Attorney-in-Fact

(Any additional signatures appear on page 3)

FOR INFORMATION ONLY-Name, Address and Telephone    OWNER'S REPRESENTATIVE (Architect,
AGENT OR BROKER:                                    Engineer or other party):
Brandish Insurance Corporation
101 Century 21 Dr. Suite 200
Jacksonville, FL 32216

AIA DOCUMENT A312 · PERFORMANCE BOND AND PAYMENT BOND · DECEMBER 1984 Ed. · AIA ®          A 312-1984          1
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON D.C. 20006
THIRD PRINTING · MARCH 1987

01/09/2002 17:31 FAX                                              ☒004/005
                                                                 ☒007

Sent By: Bowditch Insurance Corpor   ion ; 004 855 0744 ;        Jul-1E   1 10:04AM;        Page 3

bind themselves, their heirs, executors, administrators, successors, and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

2. If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under the Bond, except to participate in conferences as provided in Subparagraph 3.1.

3. If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its rights to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

6. After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and

6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

7. The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors.

8. The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

9. Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available

sty to sureties as a defense in the jurisdiction of the suit shall be applicable.

10. Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

11. When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

12 DEFINITIONS

12.1 Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Con-

tractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

12.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

12.3 Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

12.4 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

CONTRACTOR AS PRINCIPAL                          SURETY
Company:                   (Corporate Seal)      Company:                          (Corporate Seal)

Signature:                                     Signature:
Name and Title:                               Name and Title:
Address:                                    Address:

AIA DOCUMENT A312 PERFORMANCE BOND AND PAYMENT BOND DECEMBER 1984 ED., A312
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, D.C. 20006
THIRD PRINTING - MARCH 1987
                                                A312-1984    3

# AGREEMENT

This Agreement is made as of the _17_ day of April, 2001, by and between Atlantic Dry Dock Corporation ("ADDC") and Powerline Sand, Inc. ("Powerline").

WHEREAS, ADDC is the Lessee of land in Duval County, Florida designated as Dredged Material Management Area DU-6A from the Florida Inland Navigation District ("District") which ADDC currently uses as a temporary dewatering area for material from ADDC's dredging of the St. Johns River:

WHEREAS, Powerline desires to take all such material from ADDC's Leased Premises and Powerline has agreed to clean up and otherwise restore the Leased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable considerations, the parties hereto agree as follows:

1. Definitions:

(a) Lease Agreement - the Lease Agreement dated March 1, 1999 as amended on March 1, 2001 between the District and ADDC, a copy of which is attached hereto as **Exhibit 1**.

(b) Leased Premises - the Leased Premises are situated in Duval County, State of Florida, as described in Exhibit A to the Lease Agreement.

(c) District's Site Operational and Management Plan - shall be the District Site Operational and Management Plan as set forth in Exhibit C to the Lease Agreement.

(d) Dredged Material Removal Plan - ADDC's Dredged Material Removal Plan is attached hereto as **Exhibit 2**.

(e) Pre-dredge Topographic Survey - ADDC's Pre-dredge Topographic Survey is attached hereto as **Exhibit 3**.

2. Title to the Spoil Material: Contingent upon Powerline performing its Work as set forth in this Agreement, ADDC will transfer and convey its rights and title to the spoil material stored at the Leased Premises to Powerline except for the spoil material designated in Section 3(i).

3. Powerline Work: On or before March 1, 2002, Powerline will remove all of the spoil material which is approximately 136,000 cy +/- from the Leased Premises, will use the spoil material for the public use on public land, and will restore the Leased Premises to its as built condition as defined by the Pre-dredge Topographic Survey (the "Work"), all at the sole cost and expense of Powerline. Powerline will perform its Work and comply with the terms of this

Agreement, applicable law and the following in removing the spoil material from the Leased Premises and in restoring the Leased Premises:

(a)   Powerline shall furnish all labor, supervision, supplies, facilities, materials, transportation and all other things necessary for the performance and completion of the Work.

(b)   Powerline will comply with all requirements of the Lease Agreement including but not limited to the following:

(1)   Powerline will maintain the District's vegetated buffer along approximately 1,100 feet of the southern and eastern portion of the Leased Premises in accordance with Section 6 of the Lease Agreement.

(2)   Powerline shall follow the District's Site Operational and Management Plan in accordance with Section 11. B of the Lease Agreement.

(3)   Powerline will conduct and provide to ADDC and the District a post-removal topographic survey of the site containment basin in accordance with Section 11. C of the Lease Agreement.

(4)   Powerline is responsible for obtaining from the District the final determination of the completion of the dredged material removal in accordance with Section 11. C and 28 of the Lease Agreement.

(5)   Powerline is responsible for restoring the Leased Premises to essentially the same condition as when it was first leased to ADDC, save for ordinary wear and tear, in accordance with Section 28 of the Lease Agreement.

(6)   Powerline shall maintain the Leased Premises in a state of good condition, working order and repair including, but not limited to, keeping the Leased Premises free of trash or litter, complying with all building and safety codes and maintaining any improvements as set forth in the District's Site Operational and Management Plan in accordance with Section 33 of the Lease Agreement.

(c)   Powerline shall be responsible for performing the Work in compliance with all laws and industry standards.

(d)   All spoil material removed by Powerline from the Leased Premises must be used for the public use on public land. The specific application of the use of the spoil material must be approved in advance and in writing by ADDC.

(e)   Powerline Sand will provide ADDC with an affidavit upon completion of spoil removal certifying that all of the spoil material removed was used for public projects on public lands.

2

(f) Powerline will be responsible for the security of the Leased Premises during the term of this Agreement.

(g) Powerline will be responsible for occupational safety at the Leased Premises during the term of this Agreement.

(h) All of Powerline's operations on public roads must comply with Florida Department of Transportation rules, regulations, and city, county, and state laws. Powerline will be responsible for cleanup of any dirt, trash or debris deposited on any public roads and rights of way.

(i) Mobilization, spoil excavation, processing and removal, demobilization operations, restoration of the Leased Premises, and any other action required by Powerline to remove the spoil material from the Leased Premises and restore the Leased Premises will be conducted at no cost to ADDC in exchange for ADDC's conveyance to Powerline of the exclusive right to the spoil material for use on public projects except as set forth as follows:

> (1) The first one hundred fifty (150) loads of rock will be provided to five Heckscher Drive residents for shoreline protection rip-rap pursuant to ADDC's agreement with said five Heckscher Drive residents.

> (2) 30,000 cy of good compactable fill will be reserved for use by Jax Utilities Construction Company, Inc. on the ADDC Navy parking lot project.

(j) Powerline will restore the Leased Premises to its original configuration and remove any modifications Powerline makes to the Leased Premises during their Work.

(k) Powerline may request in writing an extension of the deadline for spoil material removal no later than October 31, 2001. If Powerline provides ADDC with such a written request for extension, ADDC will file a request with the District. Such time extension is subject to written approval from the District.

4. Term: All Work shall be completed by Powerline on or before March 1, 2002 unless otherwise extended as set forth in Section 3(k) above.

5. Commencement of Work: Powerline acknowledges that it has been informed that time is of the essence in the performance of its obligations called for under this Agreement. Powerline shall employ the necessary safety and security practices as are normal or as required by law for the type of Work authorized hereunder.

6. Planning and Scheduling: Powerline shall perform such planning and scheduling functions as required to establish an orderly and systematic program for completing the Work within the time allowed in this Agreement. Powerline shall prepare and submit to ADDC schedules and progress data as follows:

(a)  Within thirty days from the execution of this Agreement, Powerline shall submit to ADDC a planning schedule showing main events for the performance and completion of the Work.  Said schedule shall be revised to show all changes, progress and delays, if any, and shall be submitted to ADDC when a change or cause for delay shall occur.

(b)  Powerline shall thereafter submit monthly to ADDC a report showing the Work completed and all changes and delays, if any, to the schedule.

(c)  If Powerline falls behind the schedule, Powerline shall promptly notify ADDC in writing of any scheduling change.  Powerline shall also take all steps required, at its sole cost, to accelerate the Work to insure that the completion date set forth in Section 4 is met.

7.  Existing Conditions:  Powerline agrees to accept the Leased Premises in its AS IS condition subject to existing easements and deed restrictions.

8.  Right of Inspection:  Powerline's operations at the Leased Premises will be at all times subject to inspection and monitoring by ADDC, the District and Taylor Engineering, Inc. personnel for compliance with the requirements of this Agreement.

9.  Indemnity:  Powerline agrees to defend, indemnify and hold ADDC harmless from any claim, suit, action, proceeding, loss, liability, cost, damage or expense, including ADDC's attorney fees, arising out of or occasioned by any negligent acts, omissions or other fault of Powerline in performing the Work or any other breach of this Agreement.

10.  Insurance:  Powerline shall not claim any damages from ADDC or the District in connection with or on account of, and as between the parties shall be solely responsible for, any injuries or damages arising in or on the Leased Premises while being used by Powerline and its agents, representatives and employees.  ADDC does not warrant or represent that the Leased Premises are safe or suitable for the purpose for which Powerline is permitted to use it, and Powerline assumes all risks in its use.  Powerline, and any contractors and subcontractors utilized by Powerline pursuant to this Agreement, shall have public liability and workman's compensation insurance in the amount of not less than One Million Dollars ($1,000,000.00) and shall name ADDC, the District, and the U. S. Army Corps of Engineers as additional insureds on such policy or policies.  Powerline shall also provide not less than thirty (30) days prior written notice to ADDC and the District in the event of cancellation of such insurance.  Effective with the signing of this Agreement, Powerline shall provide to ADDC copies of said insurance policies or certificates of insurance showing conformity with this provision.  Powerline shall provide and keep in force such other insurance and in such amounts as may from time to time be required by the District against such other insurable hazards as at the time are commonly insured against in the case of other premises similarly situated or similarly utilized.

11.  Prohibition Against Liens or Other Encumbrances:  It is specifically understood and agreed that in no event shall ADDC, the District or any interest of ADDC and the District in the Leased Premises or any portion thereof be liable for or subject to any construction lien or liens for improvements or work made by or for Powerline; and this Agreement specifically prohibits subjecting ADDC and the District's interest in the Leased Premises or any portion to any construction lien or liens for improvements made by Powerline which Powerline is responsible

4

for payment under the terms of this Agreement. Powerline shall not do or permit anything to be done which purports to create a lien or encumbrance of any nature against the real or personal property contained in the Leased Premises. All persons dealing with Powerline are hereby placed on notice of this provision.

12. No Waiver of Breach: The failure of ADDC to insist in any one or more instances upon strict performance of any one or more of the covenants, terms and conditions of this Agreement shall not be construed as a waiver of such covenants, terms or conditions, but the same shall continue in full force and effect, and no waiver of ADDC of any of the provisions hereof shall in any event be deemed to have been made unless the waiver is set forth in writing and signed by ADDC.

13. Non-Discrimination: Powerline shall assure and certify that it will comply with Title IV of the Civil Rights Act of 1964 (PL 88-352) as amended and, in accordance with that Act, shall not discriminate against any individual's race, color, creed, sex, national origin, age, handicap, or marital status with respect to any activity occurring within the Leased Premises or upon lands adjacent to and used as an adjunct of the Leased Premises.

14. Compliance with Laws: Powerline agrees that this Agreement is contingent upon and subject to Powerline obtaining all applicable permits and complying with all applicable permits, regulations, ordinances, rules and laws of the State of Florida or the United States or of any political subdivision or agency of either.

15. Damage to the Leased Premises: Powerline agrees that it will not do, or cause to be done, in, on, or upon the Leased Premises or as affecting said Leased Premises, any act which may result in damage or depreciation of value to the Leased Premises, or any part thereof.

16. Hazardous Materials: Powerline agrees that, during the term of this Agreement, it:

(a) Shall keep or cause the Leased Premises to be kept free of hazardous wastes or substances.

(b) Shall not cause or permit, as a result of any intentional or unintentional act or omission on the part of Powerline or any assignees, a release of hazardous wastes or substances onto the Leased Premises.

(c) Shall comply with and insure compliance by its employees and all others under its direction with all applicable federal, state, and local laws, ordinances, rules, and regulations.

(d) The terms "hazardous waste", "hazardous substance", "disposal", "release", and "threatened release", if used in this Agreement, shall have the same meaning as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. §1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. §6901 et seq., the Florida Resource and Management Act, Chapter 403, Florida Statutes, the Pollution, Spill,

Prevention, and Control Act, Chapter 376, Florida Statutes, or any other applicable state or federal laws, rules or regulations adopted pursuant to any of the foregoing.

(e)   Shall immediately provide ADDC and the District with notice of any release or threatened release of hazardous waste within the Leased Premises, and shall immediately provide ADDC and the District with notice of any injury or action taken by any local, state, or federal governmental body with respect to hazardous waste within the Leased Premises.

(f)   Shall remove any hazardous waste or hazardous substances which exceed allowable levels in the ground or the ground water within the Leased Premises, arising from Powerline's use of the Leased Premises.

17.   Bond:  Powerline shall, at its sole cost and expense and simultaneously with the execution of this Agreement, provide to ADDC a performance bond in the amount of $_____, written through a reputable and responsible surety bond agency licensed to do business in the State of Florida and reasonably acceptable to ADDC. Said performance bond shall secure all obligations of Powerline under this Agreement, and shall be in form and content reasonably acceptable to ADDC.

18.   Termination:  If Powerline shall be adjudged bankrupt, or become insolvent, or file for voluntary bankruptcy or be subjected to involuntary bankruptcy proceedings or enter receivership proceedings, or make an assignment for the benefit of creditors, or should Powerline persistently or repeatedly refuse or fail to supply enough properly skilled workmen or proper materials, or if Powerline should fail to perform the Work, or any part thereof, with the diligence necessary to insure its progress and completion as prescribed by the time schedule addressed in Section 4 above and shall fail to take such steps or remedy such default within the reasonable time prescribed by ADDC after written notice thereof from ADDC as ADDC shall direct; or, should Powerline fail to make prompt payment to vendors and subcontractors for materials or labor, or otherwise is guilty of a violation of any provision of this Agreement, then ADDC, without prejudice to any of the other rights or remedies expressly provided for herein or by law, may terminate this Agreement or any part hereof, by written notice to Powerline and shall have the right thereafter to take possession of the Leased Premises and the spoil material. In such case of termination, ADDC shall be relieved of all further obligations hereunder and Powerline shall be liable to ADDC for all costs incurred by ADDC in completing such Work.

19.   Independent Contractor:  Powerline agrees that it is an independent contractor in the performance of any work hereunder and that neither Powerline nor its employees shall be considered employees of ADDC.

20.   Assignment:  Neither this Agreement nor any interest under it shall be assignable by either party without the prior written consent of the other party.

21.   Permits, Licenses, and Taxes:  Powerline shall procure all permits and licenses, pay all charges, and fees, and give all notices necessary and incidental to the due and lawful prosecution of the Work. Powerline shall pay all federal, state and local taxes incurred by Powerline in the performance of this Agreement.

22. <u>Notice</u>: All notices given under this Agreement shall be in writing and shall be served by certified mail to the last address of the party to whom notice is to be given, as designated by such party in writing. ADDC and Powerline hereby designate their address and the address of the District as follows:

To ADDC:          Atlantic Dry Dock Corporation
                  8500 Heckscher Drive
                  Jacksonville, Florida 32226-2400
                  Attention: Facility Engineer

To Powerline:     Powerline Sand, Inc.
                  P. O. Box 6521
                  Jacksonville, Florida 32236
                  Attention: Hendrick C. Debeer

To District:      Florida Inland Navigation District
                  1314 Marcinski Road
                  Jupiter, Florida 33477
                  Attention: Executive Director

23. <u>Partial Invalidity</u>: If any term, covenant, condition or provision of this Agreement shall be ruled by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

24. <u>Duplicate Originals</u>: This Agreement is executed in duplicate originals, each of which shall be considered an original for all purposes.

25. <u>Section Captions</u>: Articles, subsections and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope or extent of intent of this Agreement or any provisions thereof.

26. <u>Entire Understanding</u>: This Agreement sets forth the entire understanding between the parties and shall only be amended with the prior written approval of the parties.

27. <u>Venue and Governing Law</u>: The venue of any dispute litigated under this Agreement shall be Jacksonville, Duval County, Florida and the governing law in any such dispute shall be the laws of the State of Florida. The parties hereto hereby submit to the personal jurisdiction and venue of the Courts in Jacksonville, Duval County, Florida.

28. <u>Attorney Fees</u>: In the event of any litigation arising out of or resulting from this Agreement, the prevailing party in such litigation shall be entitled to its costs and reasonable attorney fees (at trial, appellate, and post-judgment proceeding levels).

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the date first above written.

Signed, sealed and delivered in
the presence of:

ATLANTIC DRY DOCK CORPORATION

_Jane W. Wilkinson_          By: _E. M. F._
_____          _____
                                 Edward J. Fleming, Its President

                                 POWERLINE SAND, INC.

_Virginia S. Allen_          By: _____
_April 17, 2001_                 Hendrick C. DeBeer, its President


_Dated this 17th day of April, 2001._

_Jane W. Wilkinson_



**EBY**

n Equal Opportunity Employer

# PURCHASE ORDER CONTRACT

## MARTIN K. EBY CONSTRUCTION CO., INC.

Page __1__ of __8__ Pages
THIS NUMBER, JOB NAME
AND DELIVERY POINT MUST
APPEAR ON ALL INVOICES.

N⁰   42113 - 014

WITH          POWERLINE SAND, INC.

Cost Code:   02-02-136
Date:   5/18/01

| Vendor Correspondence: | Vendor Remit To: | Bill To: | Ship To: |
|---|---|---|---|
| owerline Sand, Inc. | Powerline Sand, Inc. | Martin K. Eby Construction Co., Inc. | Martin K. Eby Construction Co., Inc. |
| .O. Box 6521 | P.O. Box 6521 | 2601 Maitland Center Parkway | 13256 Hammock Cir East |
| acksonville, FL 32236 | Jacksonville, FL 32236 | Maitland, FL 32751 | Jacksonville, FL 32225 |
| resident | President | Project Manager | Project Manager |
| ennie De Beer | Hennie De Beer | David A. Erickson | David A. Erickson |
| hone: (904) 781-6576 | Phone: (904) 781-6576 | Phone: (407) 331-3100 | Phone: (904) 221-6090 |
| AX: (904) 783-4225 | FAX: (904) 783-4225 | FAX: (407) 331-3614 | FAX: (904) 221-0690 |

ONTRACT PRICE $   ONE MILLION FOUR HUNDRED THIRTY-FOUR THOUSAND THREE HUNDRED ELEVEN AND 00/100

($   1,434,311.00   )

bject to additions and deductions as set forth herein.

Tax Status:  [X] Taxable   [ ] Exempt      Percent Retainage:   0%      Payment Terms:   NET 30 DAYS

n proper acceptance, we agree to purchase from you upon terms and conditions set forth herein and upon the attached page(s).

L MATERIAL SHALL BE DELIVERED FOB JOBSITE, FREIGHT PREPAID, UNLESS OTHERWISE SPECIFIED BELOW.

Furnish and deliver all materials required by the following subsection(s) of the contract between Martin K. Eby Construction Co., Inc. (hereinafter

.:actor") and   JACKSONVILLE TRANSPORTATION AUTHORITY   (hereinafter "Owner") for the construction of _____

DERWOOD CONNECTOR  (EBY JOB #42113)

13256 HAMMOCK CIR EAST, JACKSONVILLE, FL 32225 _____   (hereinafter "Prime Contract"). Materials are to be in accordance

all applicable plans and specifications of the Prime Contract, including special and general conditions, dated   1/8/01   , prepared by

ERDRUP _____   (hereinafter "Architect").

Vendor agrees to furnish, if required, shop drawings by _____ ;
samples by _____ ;
start fabrication or delivery by _____ ;
and complete performance not later than   10/31/03   .

(CHECK APPLICABLE BOX)
Vendor is registered to
collect the following sales and use
taxes applicable to this contract.

State
City
County
None

GGREGATE/RIPRAP/TRUCKING

this  _12_  day of  _June_ . _2001_

POWERLINE SAND, INC.

_[signature]_  Prt.

Number unless sole proprietorship, then
:, Number)

MARTIN K. EBY CONSTRUCTION CO., INC.

By _[signature]_
DAVID A. ERICKSON
Title   PROJECT MANAGER

[ ] Vendor/Supplier  [ ] Acknowledgment  [ ] Project Manager  [ ] Superintendent     #3

## PURCHASE CONDITIONS

1. **Incorporation of Prime Contract Documents.** Vendor is bound to Contractor by all applicable terms of the Contract Documents that are a part of the Prime Contract, and assumes toward the Contractor all the obligations that Contractor assumes toward the Owner to the extent such obligations are applicable to the materials and equipment furnished under this Purchase Order.

2. **Materials to Comply with Prime Contract.** Vendor warrants that materials and equipment furnished under this Purchase Order are new and of good quality and that such materials and equipment comply with the requirements of the Prime Contract.

3. **Nonconforming Materials.** In the event any materials or equipment delivered under this Purchase Order do not comply with the requirements of this Purchase Order and the Prime Contract, Contractor may, at its option, in addition to other remedies provided by law:

    a.  Reject the defective materials or equipment and return the same to Vendor; and/or

    b.  Require Vendor to remove and replace the defective materials or equipment or to make necessary corrections or modifications to satisfy the requirements of this Purchase Order and the Prime Contract; and/or

    c.  Make or arrange to make the necessary corrections or modifications to the defective materials or equipment, or replace them, to satisfy the requirements of this Purchase Order and the Prime Contract. Vendor shall pay to Contractor all losses or damages incurred as a result of Vendor's failure to supply materials or equipment meeting the requirements of this Purchase Order and the Prime Contract.

4. **Vendor Guarantees.** Vendor shall provide guarantees as specified in the Prime Contract or, if no guarantee is specified therein, shall provide a guarantee to replace, without cost to Contractor or to Owner, any defective or non-conforming material or equipment. Vendor shall remedy, without cost to Contractor or to Owner, any latent defects not due to ordinary wear or tear or not due to improper maintenance or operation which may develop within one year of acceptance by Owner. Acceptance by Owner and/or payment for materials or equipment by Contractor shall not relieve Vendor from the above described guarantee provisions.

5. **Changes.** When requested in writing by Contractor as a result of Owner's changes, Vendor shall make additions, deletions, or changes to the scope of the original Purchase Order. Prior to commencement of the revised work, Vendor shall submit to Contractor a written proposal of the cost increase or decrease for the revised work in the manner called for in the Prime Contract. Contractor may, if directed by Owner or for reasons of expediency or failure to reach an agreement concerning price for such changes, direct Vendor in writing to proceed with the changed work. Vendor agrees to proceed with the work as changed and accept the amount of the increase or decrease determined by Owner and the revised delivery dates, if any, or submit a claim for an adjustment in accordance with the terms and conditions of the Prime Contract.

6. **Time; Schedule Dates; Remedies.** Time is of the essence of this Purchase Order. Shop drawings, samples, and other items required by the Prime Contract shall be submitted to Contractor in accordance with the schedule specified in this Purchase Order. Materials and equipment shall be shipped so as to be received by Contractor by the date or dates specified in the Purchase Order. In the event that Vendor fails to meet those scheduled delivery dates, Contractor may, at its option, in addition to other remedies provided by law:

    a.  Cancel all or any portion of this Purchase Order and purchase on the open market the materials or equipment which have not been delivered by the specified date (or for which the shop drawings, samples, or other items have not been received on schedule). Any costs incurred by Contractor over and above the price specified in this Purchase Order shall be reimbursed to Contractor by Vendor.

    b.  Require Vendor to reimburse Contractor for any liquidated or actual damages collected from Contractor by Owner as a result of Vendor's failure to meet the specified delivery date or dates; and in addition, Vendor shall reimburse Contractor any additional damages Contractor may sustain, caused by Vendor's failure to meet its obligations under this Purchase Order, including but not limited to, the cost of additional overhead and expense.

7. **Acceptance of Terms.** The acceptance of this Purchase Order is expressly limited to the terms hereof, and any additional proposals or different terms suggested by Vendor are hereby rejected. A definite and seasonable expression of acceptance by Vendor, including beginning performance, shall operate as an acceptance of the terms offered herein. A written confirmation by Vendor or execution and return of the acknowledgment copy of this Purchase Order by Vendor shall be considered to be an acceptance even though it states terms additional to or different from those offered in this Purchase Order and even though it contains any term which purports to condition Vendor's acceptance upon Contractor's acceptance of such additional or different terms. All such additional or different terms shall be considered to be proposals for addition to this Purchase Order. Such terms shall not become part of this Purchase Order unless Contractor executes a written amendment to this Purchase Order specifically including said proposals. The conditions and provisions of this Purchase Order shall constitute the entire agreement of the parties as to the goods, materials, and products described herein; and all prior representations, conversations, proposals, or preliminary negotiations shall be deemed to be merged in this Purchase Order.

8. **Unit Prices.** Unit prices applicable to this Purchase Order shall not be subject to increase or decrease due to differences between any estimated quantities and the actual quantity used to perform the Prime Contract requirements unless said price change is authorized by the Prime Contract. Contractor shall only be liable for the actual quantity used to perform the Prime Contract. Unit prices stated in this Purchase Order are not subject to escalation unless so stated.

9. **No Assignment.** Vendor shall not assign this Purchase Order nor sub-contract any portion of the work hereunder, including shop drawings preparation, without prior written notification to Contractor.

10. **No Claims Against Vendor; Payments; Release Forms.** Vendor warrants that there are no known claims against it for unpaid labor, materials, equipment, or other charges relating to Vendor's performance of this Purchase Order. Contractor may, at its option, make payments for labor or material jointly to Vendor and any person, firm, or corporation to whom Vendor is indebted for labor performed or material furnished in the performance of this Purchase Order. If requested to do so by Contractor, Vendor shall execute Contractor's standard Receipt and Release Form and furnish additional evidence of payment of specific claims relating to this Purchase Order.

11. **Indemnity.** Vendor agrees to indemnify, defend and hold Contractor harmless from any and all claims, demands, suits, and/or causes of action of any kind or nature whatsoever, including, but not limited to, claims for patent infringement, which may be brought against Contractor by any supplier, subcontractor, laborer, or any other person, organization, or entity and any and all costs, expenses, settlements, and judgments related thereto, including, but not limited to, reasonable attorney's' fees and court costs which arise from or in any way relate to Vendor's performance of or failure to perform this Purchase Order.

☐ Vendor/Supplier   ☐ Acknowledgment   ☐ Project Manager   ☐ Superintendent



# CONTINUATION SHEET

An Equal Opportunity Employer

Page __3__ of __8__ Pages

N⁰ __42113 - 014__

Project: __Wonderwood Connector__                    Cost Code: __03-02-136__

Location: __Jacksonville, FL__                          Date: __5/18/01__

WORK:   Dirt/Aggregate/Riprap/Trucking

Furnish all the materials, supplies and all else necessary to provide Dirt/Aggregate/Riprap/Trucking for the project known as Wonderwood Connector, to the satisfaction of the Contract Documents and the Owner.

A.  Pricing

1.  The Vendor will furnish and deliver Dirt/Aggregate/Riprap/Trucking to meet the contract plan and specification requirements at the following unit prices:

| | | | |
|---|---|---|---|
| Fill Dirt Eastside of Intercoastal (Material & Freight) | ~~89,892 TCY~~ | $4.00 | $359,568 |
| Fill Dirt Westside of Intercoastal (Material & Freight) | 140,429 TCY | $2.50 | $351,073 |
| Import Stabilizer (Material & Freight) | 50% ~~10,785 TCY~~ | $4.17 | $44,973 |
| Hourly Trucking | 0 HR | $40.00 | $0 |
| Limerock (Material & Freight) | 50% ~~20,340 TON~~ | $11.25 - | $228,825 * |
| Riprap (Material & Freight) | ~~11,560 TON~~ | $27.50 | $317,900 * |
| Bedding Stone (Material & Freight) | ~~4,459 TON~~ | $27.50 | $122,623 * |
| Gabion Stone (Material & Freight) | ~~340 TON~~ | $27.50 | $9,350 * |
| Dump Fee | 0 EA | $150.00 | $0 |
| Trash Truck | 0 HR | $65.00 | $0 |

TOTAL THIS CONTRACT      $1,434,311

2.  All applicable taxes are included in the above unit prices.

3.  The unit prices above are included as part of this contract. The parties agree that unit prices cover all expenses whatsoever plus overhead and profit for the performance of the specified work to include design, fabrication, delivery, erection, and certification.  Unit prices apply to all work and shall be cumulative (adding increases and decreases together) rather than applying to each individual charge.

4.  All unit prices are firm even though quantities may be increased or decreased significantly. Accordingly, there is no quantities adjustment clause appropriate to this Agreement.

5.  Terms: Net 30 Days.

6.  Prices are F.O.B. job site.

☐ Vendor/Sub      ☐ Acknowledgment      ☐ Project Manager      ☐ Superintendent

**CONTINUATION SHEET**

**EBY**

An Equal Opportunity Employer

N<u>o</u>   42113 - 014

| | |
|---|---|
| Project: __Wonderwood Connector__ | Cost Code: __03-02-136__ |
| Location: __Jacksonville, FL__ | Date: __5/18/01__ |

## B. Scope of Work

1. The Vendor acknowledges and agrees that any recapitulation of the work to be performed shall be for the sole and exclusive purpose of clarifying the status of those items which are specifically mentioned as being included in, or excluded from, the scope of this Purchase Order Contract. The exclusion of any work covered by one section or division of the prime contract specifications does not exclude work covered by another section of those specifications.

2. The Vendor shall provide and, subsequently, remove any and all protection required to keep adjacent areas and materials, existing structures, curbs, barriers, vegetation, etc. free from damage resulting from their operation. Any damage resulting from the Vendor's operation shall be the Vendor's responsibility.

3. All workmanship shall be of the best procurable kind, both as to materials and labor, that are required by the specifications and the prime contract requirements; and, in regard to any part of the work wherein the specifications or the contract is silent as to quality, it is understood the best quality is required.

4. The Vendor shall not damage final work already in place or any work in progress. Any repair work to the above items that is required because of Vendor's operations will be charged to the Vendor's account.

5. If the Vendor falls behind schedule through no fault of the Contractor or the Owner, the Vendor shall work overtime or perform shift work at no extra cost to Contractor as necessary to maintain the job project schedule.

## C. Specifications and Contract Drawings

1. Plans and Specifications - (including Addenda 1 through 3).
   a) Plans/Drawings as described below:
      (1) Contract Plans as listed by detailed index on key sheet on each component set of plans stamped "Released For Construction Jan 8, 2001". Component sets as listed below:
         (a) Roadway Plans
         (b) Signing and Pavement Marking Plans
         (c) Roadway Lighting Plans
         (d) Aesthetic Lighting Plans
         (e) Structure Plans
         (f) Utility Improvement Plans
   b) Specifications as described below:
      (1) FDOT Standard Specifications for Road and Bridge Construction, 1999.
      (2) FDOT Roadway and Traffic Design Standards Index, 1998.
      (3) FDOT Structures Design Office Standard Drawings, 1997.
      (4) Contract Documents dated December 2000, Jacksonville Transportation Authority, complete.
      (5) Addenda 1 through 3 are included as part of this contract.

2. Any substitutions must be submitted in accordance with Specification Section 5-1.4.11.

A-24 (7/11/2000)

☐ Vendor/Sub   ☐ Acknowledgment   ☐ Project Manager   ☐ Superintendent

**CONTINUATION SHEET**

EBY

n Equal Opportunity Employer

Page __5__ of __8__ Pages

N⁰ __42113 - 014__

Project:   Wonderwood Connector                      Cost Code:  __03-02-136__
Location:  Jacksonville, FL                           Date:  __5/18/01__

**Submittals and Schedule**

1. All work shall be coordinated and performed in accordance with the overall project requirements and schedule including:
    a) Sequence
    b) Required move-ins
    c) Equipment and manpower requirements
    d) Coordination and cooperation with Eby and other Vendors

2. The Vendors will be coordinated by the Contractor's Project Superintendent to meet the Contractor's construction sequence and schedule. The Vendor shall allow others sufficient access and time to perform their work consistent with such schedule.

3. The Vendor shall be present at all weekly scheduling meetings as directed by the job site Superintendent.

4. The Vendor shall cooperate with the Contractor in the preparation of the weekly construction schedules. Any deviations from the Contractor's schedule must be approved by the Contractor in writing.

5. All invoices concerning this contract shall be mailed to:
    (a) Martin K. Eby Construction Co., Inc.
    (b) 2601 Maitland Center Parkway
    (c) Maitland, Florida 32751
    (d) Attn: David A. Erickson

6. All other correspondence concerning this contract, i.e. submittals, etc., shall be mailed to:
    (a) Martin K. Eby Construction Co., Inc.
    (b) 13256 Hammock Circle East
    (c) Jacksonville, FL 32225
    (d) Attn: David A. Erickson

7. All materials and equipment shall comply with the plans and specifications and are subject to review and approval by the Architect/Engineer. Any such review and/or approval shall not relieve Vendor of the responsibility of fully complying with the plans and specifications and the Contract documents.

8. The Vendor shall immediately proceed (and in no event later than three (3) days) with submittal of all required shop drawings, catalog cuts or material samples upon receipt of this Purchase Order Contract.

9. Any costs backcharged to the Contractor from the Engineer for review of submittals that were not approved by the second submittal will be backcharged to the Vendor.

10. All warranties and guarantees shall be exactly as required by the prime contract without regard to the manufacturer's or Vendor's standard warranty.

11. All certificates of compliance, certified test reports, etc. required by the prime contract specifications are included as part of this contract.

12. Required backfill material test samples and gradations will be furnished by the Vendor.

**Conditions**

☐ Vendor/Sub     ☐ Acknowledgment     ☐ Project Manager     ☐ Superintendent

## CONTINUATION SHEET

Page __6__ of __8__ Pages

**EBY**

An Equal Opportunity Employer

N⁰ __42113 - 014__

| | |
|---|---|
| Project: __Wonderwood Connector__ | Cost Code: __03-02-136__ |
| Location: __Jacksonville, FL__ | Date: __5/18/01__ |

1. The Contractor will provide Builders Risk Insurance for the Contractor and Vendors under this Agreement. The Builders Risk Policy the Contractor will provide contains twenty thousand dollar ($20,000.00) deductible per incident and all claims will be subject to this deduction if caused by or the responsibility of Vendor.

2. The Vendor shall have no claim against the Contractor as a result of funds delayed or withheld by the Owner in accordance with the Contract Specifications.

3. Any funds withheld by the Owner from the Contractor for any reason involving the Vendor shall, likewise, be withheld from the Vendor when not the cause or fault of Contractor until such time as the cause for withholding is resolved.

4. The Vendor shall conduct their own quality control required by the contract plans and specifications and submit necessary reports and certifications to the Contractor.

5. The location of all access ramps, roads, and on-site storage shall be coordinated with and approved by the Contractor's Project Superintendent.

6. The Vendor shall clean up, remove and dispose of, in a timely manner, all trash and debris associated with their work. Should the Vendor fail or refuse to perform their own clean up, the Contractor's Project Superintendent will cause this work to be performed and all such related costs will be assessed to the Vendor.

7. The Vendor will be responsible for:
   a) Keeping all streets and roads free of debris and repairing any damage caused by Vendor's operations.
   b) Controlling dust during their operations.
   c) Disposing of all waste material.
   d) Protecting designated areas or items from damage by Vendor's operations.

8. Wages paid to all of the Vendor's employees shall be in accordance with the job classifications and wage rates as required by the Contract Specifications and all applicable wage laws.

9. Current payroll submittals as required by the prime contract shall be received by the Contractor prior to payment being made under this Purchase Order Contract.

10. Any deviations from or discrepancies in the plan, specification, schedule or submittal requirements shall be brought to the immediate attention of the Contractor in writing with sufficient details, references and explanations to permit proper analysis. Suggested solutions or substitutions may accompany the notification but Contractor is under no obligation to accept or implement such suggestions. Unless and until there is a change officially approved by the Owner and/or Engineer in the form of a change order, Vendor is bound to fully comply with all requirements of the contract documents.

11. The Vendor shall submit reports and submittals in accordance with the Contract Specifications. Failure to furnish required information may be cause for withholding payment (in whole or in part) until all requirements are met.

12. The Vendor shall submit cost estimates on change order proposals in advance of any change order work being performed and in complete and full analytical detail as required or requested by the Contractor or Owner.

13. Extra work performed by the Vendor shall conform to the extra work (and other applicable) requirements of the prime contract.

Conditions (continued)

☐ Vendor/Sub    ☐ Acknowledgment    ☐ Project Manager    ☐ Superintendent

# CONTINUATION SHEET

**EBY**

An Equal Opportunity Employer

Nᵒ 42113 - 014

Project: Wonderwood Connector
Location: Jacksonville, FL

Cost Code: 03-02-136
Date: 5/18/01

14. Delays in completion of the work or time extensions will only be allowed to the extent such delays or extensions are allowed to the Contractor by the Owner.

15. If required, project gates will be designated for entry to and exit from the job site for use by Vendors. The Vendor shall use the designated gate for all entry and exit for workmen, materials and all other construction-related entry to or exit from the job site.

16. Notwithstanding anything in this Purchase Order Contract to the contrary and as a material inducement for the execution of this Purchase Order Contract by the Contractor, the Vendor represents and agrees that labor difficulties directed at, or connected with, any employer affiliated with the project will not disable, hinder, or prevent Vendor from timely continuing and maintaining performance and/or deliveries as required by the progress of the prime contract. In the event that such labor difficulties cause Vendor to delay the Owner or the Contractor of the progress on the prime contract, the Contractor shall have the rights provided and the right to proceed as set forth in Section 8 of this Purchase Order Contract, or at Contractor's option, the rights provided and the right to proceed as set forth in Section 25 of this Purchase Order Contract.

17. This contract is subject to cancellation if Vendor fails to deliver all or part of the purchased materials according to Contractor's schedule. In such event, Contractor shall have all remedies available under the commercial code of the jurisdiction where the project is located.

18. Any funds withheld by the Owner from the Contractor for any reason involving Vendor when not the cause or fault of Contractor shall, likewise, be withheld from Vendor until such time as the cause for withholding is resolved.

19. The cost of any overrun in materials furnished by the Contractor, required because of the Vendor's methods or operation, will be charged to the Vendor.

## F. Safety, EPA, EEO, Hazard Communication, etc.

1. The Vendor shall be responsible for complying with all federal, state and local rules and regulations governing safety, working hours, noise, traffic, etc. The Vendor shall hold weekly safety meetings and provide reports of the same to the Contractor.

2. The Vendor shall install all work in accordance with all federal, state, and local rules, regulations, codes, etc. Any deviation or discrepancy between the project plans and specifications with any of these rules, regulations, codes, etc. shall be brought to the immediate attention of the Contractor in writing before Vendor proceeds with the work.

3. The Contractor will establish a safety program in accordance with industry standards and the Occupational Safety and Health Act (OSHA). The Vendor shall comply with the requirements of this program at all times while working on this project. As part of this project, Vendor shall furnish each of its employees with (or see to it that such employees have) OSHA approved safety equipment including, but not limited to, hard hats and safety glasses and require their use. Any of the Vendor's employees who fail to comply with this requirement will be promptly removed from the job site.

4. The Vendor's field supervisor shall attend the weekly supervisors' safety meeting during the time the Vendor is working on this project. The meeting time and location will be scheduled by Contractor's Project Superintendent.

5. The Vendor shall comply with the attached "Drug, Alcohol - Prohibited Articles Policy."

## CONTINUATION SHEET

◇ EBY

An Equal Opportunity Employer

N⍛   42113 - 014

Project:   Wonderwood Connector

Location:   Jacksonville, FL

Cost Code:   03-02-136

Date:   5/18/01

6.  The Vendor agrees that if in the performance of this Purchase Order Contract it becomes necessary, convenient or advisable to remove, replace or interfere with any safety device or controls installed by the Contractor or another Vendor, the Vendor shall replace or restore such devices or controls at Vendor's expense. In the event such safety devices or controls are not so replaced or restored, the Vendor agrees to reimburse the Contractor for doing so.

7.  The Vendor shall supply to the Contractor a complete accident report on any fatality or serious job injury to any of their employees within 24 hours of such occurrence.

8.  The Vendor shall comply with all requirements of the Hazard Communications Standard established for the construction industry by Federal Laws, Rules and Regulations which are applicable by Vendor's products supplied to the project including, but not limited to, a Material Safety Data Sheet in appropriate form and content in compliance with said standard for all such materials and products supplied.

9.  The Vendor shall provide the Material Safety Data Sheet for each product furnished by vendor to the project to Contractor prior to the delivery of Vendor's products to Contractor. Notwithstanding any other pay provisions set forth herein or in the prime contract, the Contractor shall not be obligated to pay the Vendor for materials and products furnished to the project until such time as the Vendor has complied with the requirements of this paragraph.

10.  The Vendor shall take all reasonable and necessary actions to prevent pollution of the air, creeks, streams, rivers and water bodies in the area. All permits required to perform this work shall be obtained by the Vendor.

11.  The Vendor shall comply with all EEO, MBE, WBE, SBE, etc. requirements of the contract.

12.  The Vendor shall comply with the attached E.E.O. letter.

13.  The requirements of the Immigration Reform and Control Act of 1986 (IRCA) shall be applicable to this Purchase Order Contract. The Vendor agrees to indemnify, defend, and hold Contractor harmless from any and all damages, loss, or liability whatsoever, including but not limited to, attorney fees, arising from and/or related to Vendor's failure to comply with said IRCA requirements. This Purchase Order Contract shall be subject to Termination for Default if Vendor fails to comply with the IRCA requirements.

14.  The Vendor agrees to comply with Eby safety policies including, but not limited to, all personnel (drivers) on site must wear hard hats, safety glasses, long pants, shirts, etc.

☐ Vendor/Sub     ☐ Acknowledgment     ☐ Project Manager     ☐ Superintendent

**St. Johns River Ferry**
*Gateway to Fort George Island*

| | |
|---|---|
| Pedestrian/Bicycle | |
| Motorcycle | .50 |
| 2 axle (Private) | 2.50 |
| 2 axle (Commercial/RV) | 2.75 |
| 3 axle (Private/Commercial/RV) | 3.00 |
| 4 axle (Private/Commercial/RV) | 3.25 |
| 5 axle (Private/Commercial/RV) | 4.00 |
| Passenger Bus | 4.50 |
| Semi–Tractor/trailer | 7.50 |
| | Prohibited |

First ferry 6:00AM (M–F) 6:20 AM (SS) Every 30 minutes
Last Ferry 10:00 PM

Operated by: *Hornblower Marine Services*



FOR ATTENTION: JOHN TUCKER

#4



TIRE SIZE
10:00 X 20

MAXIMUM WEIGHT
ON REAR AXLE IS
44,000 POUNDS

MAXIMUM WEIGHT
ON FRONT AXLE IS
14,520 POUNDS

TIRE SIZE
12:00 X 20

MAXIMUM GROSS WEIGHT 70,000 POUNDS
(FOR 4-AXLE TRUCK)
MAXIMUM SINGLE-AXLE WEIGHT IS 22,000 POUNDS
(TIRE SIZE LIMITS ALSO APPLY)

    

att . John Tucker .

*PJM*



**JACKSONVILLE PORT AUTHORITY**

Post Office Box 3005
2831 Talleyrand Avenue
Jacksonville, Florida 32206-0005
www.jaxport.com

(904) 630-3064
January 4, 2002

Mr. Hennie De Beer, President
Powerline Sand Incorporated
13400 Sutton Park South, Suite 1104
Jacksonville, Florida 32224

RE:  License and Use Agreement Bucks Island
     for Powerline Sand Incorporated

Dear Mr. De Beer

Enclosed please find an original, fully executed Dredging and
Dredge Disposal Use Agreement between Powerline Sand Incorporated
and the Jacksonville Port Authority.

If there are any questions or concerns regarding this agreement,
please advise at 630-3013.

                    Sincerely,

                    Frank Jones, Project Engineer
                    Engineering & Construction

FJ/mg
Enclosure

cc:  Hennie De Beer w/orig.
     Jim Carleton w/orig.
     Elaine Varnot w/copy
     Frank Jones w/copy

*Making Jacksonville the Port of Choice*
**Blount Island Marine Terminal • Talleyrand Marine Terminal • Dames Point Marine Terminal**

#6

# JACKSONVILLE PORT AUTHORITY

# LICENSE AND USE AGREEMENT

# FOR

# BUCKS ISLAND SPOIL AREA
# SOURCE OF BORROW MATERIAL

*File in my off new agreement*

NOVEMBER, 2001

LICENSE AND USE AGREEMENT

FOR

BUCK'S ISLAND SPOIL AREA

SOURCE OF BORROW MATERIAL

THIS AGREEMENT made and entered into this *13th* day of *Dec* ,2001 by and between the JACKSONVILLE PORT AUTHORITY, a body politic and corporate, created and existing under Chapter 63-1447, Laws of Florida, as amended, hereinafter referred to as the AUTHORITY, and POWERLINE SAND INCORPORATED doing business in Jacksonville, Florida, whose business address is 13400 Sutton Park South, Suite 1104, Jacksonville, Florida 32224, hereinafter referred to as LICENSEE.

WITNESSETH:

WHEREAS, the AUTHORITY, as local sponsor for the Jacksonville Harbor Navigation Project, is responsible for providing suitable dredge spoil areas to the U. S. Army Corps of Engineers for use in maintaining the harbor depth; and,

WHEREAS, the AUTHORITY, in fulfilling this responsibility, manages the Buck's Island spoil area located in Section 27, Township 1 South, Range 28 East on the south side of the St. Johns River, in Duval County, Florida, under agreement with the Florida Department of Natural Resources, owner of Buck's Island; and,

WHEREAS, the limit of truck trips on Ft. Caroline Road is limited to a maximum of 100 per day and, WHEREAS, the AUTHORITY'S management agreement provides for the periodic removal of spoil material from Buck's Island to restore capacity of the site and thereby prolong its useful life as spoil area; and,

WHEREAS, the LICENSEE, in conducting its construction business, desires to excavate, remove and make use of spoil material previously deposited on Bucks Island, which will be hauled by truck to the site of and incorporated into the construction of the JTB Auxiliary Lane Addition Segment I, hereinafter referred to as the Project, publicly owned and funded under the jurisdiction of the CITY OF JACKSONVILLE (Governmental or Public Agency), hereinafter referred to as Jurisdictional Agency; and,

WHEREAS, the interests of the AUTHORITY, the LICENSEE, and the Jurisdictional Agency will all be served and enhanced by the productive utilization of the spoil material on Buck's Island in constructing the Project.

NOW THEREFORE, for and in consideration of the benefits that will accrue to the LICENSEE as a result of the use of Buck's Island spoil material to be provided by the AUTHORITY, the parties hereto agree and covenant as follows:

1. This Agreement contemplates only the orderly excavation and removal of existing spoil material from Buck's Island site.  No manufacturing, processing or refining activities will be permitted, and the site may not be utilized for any purpose other than as a source of borrow material.

2. Spoil material removed from Buck's Island can only be used on publicly owned lands in conjunction with construction and/or filling operations sponsored by a recognized governmental or public agency in Duval County.

3. The LICENSEE, shall have a responsible person available at or reasonably near and in radio contact with the worksite whenever any work is in progress on the site, in order that he may be contacted in emergencies and in cases where immediate action must be taken to maintain traffic or to handle any other problem that might arise.  For compliance with this requirement

outside of working hours, LICENSEE shall provide a telephone number or numbers where such persons can be reached on a 24-hour basis.

4. The LICENSEE shall not sublet, sell, transfer, or assign this Agreement or any portion thereof, nor any of the rights or responsibilities created hereunder.

5. The LICENSEE shall indemnify, defend and save harmless the State of Florida, the City of Jacksonville, the AUTHORITY and all of their respective officers, agents and employees from all suits, actions or claims brought because of any injuries or damages sustained by any person or property on account of the LICENSEE's operations in connection with this Agreement; or on account of or in consequence of any neglect in safeguarding the work; or through the use or improper means or methods in executing the work; or because of any act or omission by the LICENSEE; or from any claims or amounts arising or recovered under the Worker's Compensation Law or any other law.

The LICENSEE and his surety shall be held liable until such suits, actions or claims for injuries or damages, as aforesaid, shall have been settled and suitable evidence to that effect furnished to the AUTHORITY.

Except as streets and highways of the City may be used by LICENSEE resulting in compensable damages payable to the City under contractor's PPDL insurance as provided in Section 6.c. hereof, it is specifically agreed between the parties executing this Agreement that it is not intended by any of the provisions of any part of the Agreement to create in the public or any member thereof, a third party beneficiary hereunder, or to authorize anyone not a part to this Agreement to maintain a suit for personal injuries or property damage pursuant to the terms or provisions of this Agreement.

6. Before any work at this site may commence, the LICENSEE shall furnish to the AUTHORITY valid and current certificates evidencing insurance coverage of the following types:

BUCK'S ISLAND SPOIL AREA SOURCE OF
BORROW MATERIAL (8/11/01)                                    3 of 11

a. **WORKMAN'S COMPENSATION AND EMPLOYER'S LIABILITY.**

b. **PUBLIC LIABILITY AND PROPERTY DAMAGE LIABILITY:** With respect to the operations he performs, LICENSEE's Public Liability Insurance shall provide for a limit of not less than $500,000 for all damages arising out of bodily injuries to or death of one person, and subject to that limit for each person, a total limit of $1,000,000 for all damages arising out of bodily injuries to, or death of two or more persons in any one occurrence, and regular Property Damage Liability Insurance providing for a limit of not less than $100,000 for all damages arising out of injury to, or destruction of, property in any one occurrence and, subject to that limit per occurrence.  If any part of the work is sublet, similar insurance shall be provided by or on behalf of the subcontractors to cover their operations.

c. **CONTRACTOR'S PROTECTIVE PUBLIC LIABILITY PROPERTY DAMAGE LIABILITY INSURANCE.** With respect to the operations performed or the LICENSEE by subcontractors' Protective Public Liability Insurance providing for a limit of not less than $500,000 for all damages arising out of bodily injuries to, or death of one person and, subject to that limit for each person, a total limit of $1,000,000 for all damages arising out of bodily injuries to, or death of two or more persons in any one occurrence, and regular Contractor's Protective Damage Liability Insurance providing for a limit of not less than $100,000 for all damages arising out of injury to, or destruction of property in any one occurrence.

d. **COMPREHENSIVE AUTOMOBILE LIABILITY** for owned, hired, and non-owned vehicles of all types used in conjunction with work under this Agreement.  Coverage limits shall be not less than $300,000 bodily injury per occurrence and $100,000 property damage per occurrence.

e. If the LICENSEE provides insurance coverage(s) subject to an aggregate limit, then Supplementary Excess Liability policy coverage shall be provided in the amount of

$1,000,000.  Certificate(s) shall state any aggregate limit(s) which may be applicable.

f.  The AUTHORITY shall be specifically listed as additional named insured on the above policies.

g.  The LICENSEE shall provide the AUTHORITY with not less than 30 days advance notice of policy cancellation, expiration or lapse date, or changes in insurance companies or coverage.  The LICENSEE will be deemed to be in breach of this Agreement if at any time during its operations on the site it fails to provide complete, continuous and uninterrupted insurance coverage specified herein.

## 7.  LICENSEE'S USE OF EXISTING ROADWAYS.

a.  The LICENSEE shall not permit his equipment, while it is on or traversing an existing road or street, to interfere with traffic.

b.  Any hauling unit or equipment loaded in excess of the maximum weights set out in Florida Uniform Traffic Control Law, or lower weights which may be legally established for any section of road or bridge by the Department of Transportation of local authorities, shall not be operated on any road or street except as provided by a special permit issued by the governmental agency having jurisdiction over a particular road or bridge.  This requirement applies to existing paved roads and bridges on the LICENSEE's approved haul route except as may be otherwise permitted on an exceptional basis by the governmental agency having jurisdiction.

c.  Positive measures shall be taken by the LICENSEE to assure that its equipment does not cause damage to existing roads.  If any such damage should occur, it shall be repaired by the LICENSEE without delay and at its expense.

    d.  The LICENSEE shall furnish and pay for any road maintenance bonds, deposits, or the like in the event such are required by the governmental agency having jurisdiction over a particular road and bridge.

8.  <u>PRESERVATION OF PROPERTY.</u>

    a.  The LICENSEE shall preserve from damage all property along the line of work, which is in the vicinity of, or is in any way affected by the work.  This applies to public and private shrubs, crops, signs, monuments, fences, guardrail, pipe and underground structures, public highways (except natural wear and tear of highway resulting from legitimate use thereof by the LICENSEE), and whenever such property is damaged due to the activities of the LICENSEE it shall be immediately restored to a condition similar or equal to that existing before such damage or injury was done by the LICENSEE, and at his own expense, or he shall make good such damage or injury in an acceptable manner.

    b.  The LICENSEE shall protect existing bridges during the entire borrowing period from damage caused by any of his operations or equipment.  The LICENSEE will be required at its own expense to make immediate repairs of any damage occasioned by its use or operations.

9.  The AUTHORITY makes no representation as to the quality, suitability, or consistency of the spoil material on Buck's Island.  The LICENSEE is responsible for visiting the site, examining the spoil material and fully considering all other pertinent factors which may affect his contemplated activities on Buck's Island, and therefrom drawing his own conclusions as to the economics and feasibility of such activities.

10. The LICENSEE shall furnish to the AUTHORITY prior to commencement of any work hereunder a working schedule and excavation sequence plan for review and approval.

Subsequently, the LICENSEE shall promptly notify the AUTHORITY of any contemplated changes to the approved schedule or sequence, and shall promptly furnish revised documents for review and approval. The AUTHORITY hereby agrees that it will not unreasonably withhold approval of such submittals, although right is reserved by the AUTHORITY to direct changes in same as may be deemed prudent and in its best interest. The AUTHORITY reserves the right to designate the point or points at which the work is to be started and the general limits of excavation, which shall be commensurate with quantity of material needed by LICENSEE. For additional requirements see Attachment "A".

11. Access maintenance fees shall be paid to the AUTHORITY for the cost of maintenance of the Buck's Island facility. The fee shall be $0.25 per cubic yard leaving the Island. In accordance with the LICENSEE'S approved excavation sequence plan referenced in Article 10, the area designated for borrow shall be staked for lines and surveyed for elevations. The fee shall be calculated based on the volume of material removed and the stated fee per volume.

The LICENSEE shall be responsible for the arrangement and payment of the surveys to be performed by an independent Florida registered, land surveyor. The "Before" survey shall be submitted to JPA 10 days before beginning work, and the "After" survey shall be submitted to JPA within 20 days after completion, plus the calculated quantities of material removed.

12. PROSECUTION OF THE WORK.

  a. The LICENSEE shall arrange its work and operations so as not to interfere with the operations of other licensees who may, from time to time, be excavating material on other portions of Buck's Island.

Each LICENSEE will be held responsible for any damage done by it, its agents, or its subcontractor. LICENSEE agrees to cooperate fully with the AUTHORITY and with other

licensees to promote general harmony and to facilitate operations on the site.

b.  In the interest of public safety and to alleviate traffic congestion, as long as the LICENSEE is working at a maximum rate of 100 truck trips from Buck's Island per day, no other contractors will be authorized to haul material from Buck's Island.  Should the average number of trips fall below 50 per day, other contractors may be allowed to utilize the site as long as the truck trip limit of 100 trips per day is not exceeded.  For purposes of this Agreement a trip is defined as one direction of travel between two points.

c.  The LICENSEE shall notify the AUTHORITY in writing of its intention to begin work, not less than five (5) days in advance of the date on which he proposes to begin.  The LICENSEE shall also notify the AUTHORITY in writing within five (5) days after the date on which it has completed work on the site.  The LICENSEE shall remain responsible for security of the site until the AUTHORITY has been duly notified of LICENSEE's completion of operations, and until keys to the access gate have been returned to the AUTHORITY.

d.  <u>ALL WORK ON BUCK'S ISLAND</u> shall be performed only during daylight conditions between the hours of 8:00 a.m. and 6:00 p.m., Monday through Saturday,

without exception.  Vehicular activity (arriving, standing, parking, queuing or otherwise) in the vicinity of the site (Ft. Caroline Road or Buck's Island) by LICENSEE or its subcontractors prior to 7:45 a.m. on designated workdays is prohibited.

e.  The LICENSEE shall, at all times, conduct the work in such a manner and in such sequence as to insure the least practicable interference with traffic.  The LICENSEE's vehicles and other equipment shall be operated in such a manner that they will not create a nuisance, hazard, or hindrance to the traveling public.  Maximum safe travel speed for heavy trucks on Ft. Caroline Road, north of Monument Road, has been established at 25 miles per hour.  The LICENSEE shall take positive measures to insure that its employees and subcontractors fully

comply with the same.

f.   Consistent with public interest, safety, and good practice, all equipment and machinery used shall be maintained in a satisfactory working condition throughout the period they are on the worksite.   This will include adequate equipment maintenance procedures to insure the elimination of unnecessary noise caused by loose body parts on all construction equipment.   All engines shall be equipped with functional exhaust silencers.   Equipment which is determined by the AUTHORITY to be excessively noisy shall be removed from the job, or altered or repaired to the satisfaction of the AUTHORITY.   Excessive tailgate banging by haul trucks will be prohibited.   All stationary equipment such as pumps, compressors, generators, etc., shall be screened from noise sensitive receivers if the equipment is to operate beyond normal working hours in order to reduce noise impacts.

g.   No vehicles or equipment shall be permitted to approach or to operate closer than 200 feet to existing shoreline vegetation other than while traversing the access bridge; nor closer than 100 feet to the top of slopes of existing dikes unless specifically approved and permitted in writing by the AUTHORITY on a case-by-case basis.   Any damage caused to either shoreline vegetation or existing dikes shall be repaired to the satisfaction of the AUTHORITY at the LICENSEE's expense.

h.   The LICENSEE shall be responsible for maintenance of the existing gate across the access road to Buck's Island.   This gate must be closed and locked each and every day during nonworking hours, for which the LICENSEE accepts full responsibility while performing any work pursuant to this Agreement.

i.   Upon completion of his work on Buck's Island, the LICENSEE shall restore the dike(s), leave the site clean, free of rubbish, debris, noxious materials and the like caused or occurring as a result of his activities on the site.   All such waste products must be removed from Buck's Island and disposed of in a suitable manner.

13. The LICENSEE shall post a $25,000 construction bond or equivalent as guarantee of final payment to the Authority and that the dikes and overall property will be restored upon completion of the Project.

14. In the event that the LICENSEE fails to comply fully with the terms and conditions of this Agreement, and upon 10 calendar days advance written notice to the LICENSEE by the AUTHORITY, specifically citing the areas of noncompliance and providing that within the 10-day period the LICENSEE fails to take corrective action relative to the areas of noncompliance, the AUTHORITY may at its sole discretion, terminate this Agreement and revoke the LICENSEE's permission to have access to and remove spoil material from Buck's Island. Thereafter, the LICENSEE shall have 48 hours to remove all of his equipment and possessions from the site. No further access to the site will be permitted the LICENSEE after that time. In the event of such termination, the LICENSEE and his surety shall remain fully responsible for any damage done or claims made as a result of work performed under this Agreement by LICENSEE.

15. This License and Use Agreement shall expire upon completion of LICENSEE's work on the Project, or 24 months after the date first written above, whichever occurs first. This Agreement is renewable at 6-month intervals, by the mutual agreement of the parties.

**IN WITNESS WHEREOF,** the AUTHORITY and LICENSEE have mutually executed this Agreement as of the day and year first written above.

**Signed, Sealed and Delivered**

**in the presence of:**

_Marty Mew_

_____

_____

**Signed, Sealed and Delivered**

**in the presence of:**

_____

_____

_____

**APPROVED TO FORM:**

_____

Office of General Counsel (Signature on File)

**JACKSONVILLE PORT AUTHORITY**

By: _F. R. Finn_

Title: _EXECUTIVE DIRECTOR_

**(POWERLINE SAND INCORPORATED)**

By: _____

Title: _Prst._

Firm: _POWER LINE SAND INC._



03/18/02  NF:5N FAX 1 603 JG8 1J4R     NGM BOND                        @002/005

**National
Grange
Mutual
Insurance
Company**



55 West Street
P. O. Box 2300
Keene, NH 034317080
(603) 352-4000

Via Fax & US Mail
904-251-1533

Monday, March 18, 2002

Mr. Robert Tate
Atlantic Dry Dock Corp.
8500 Heckscher Drive
Jacksonville, FL 32206

RE:    Principal:    Powerline Sand Inc.
       Bond No.:     S-701384

Dear Mr. Tate:

The above referenced bond of Old Dominion Insurance, a copy of which is attached,  remains in full
force and effect.

Thank you in advance for your attention to this matter.

Sincerely,

Eli Cinq-Mars
Bond Claims Attorney

Bcc:   Robert E. Morris
       5020 West Cypress Street
       Suite 200
       Tampa, FL 33607

ECM/ls

**EXHIBIT B**

**#7**

# EXTENSION AGREEMENT

On April 17, 2001, Atlantic Dry Dock Corporation ("ADDC") and Powerline Sand, Inc. ("Powerline"), entered into an Agreement regarding the removal of spoil material generated from ADDC's dredging operations on the St. John's River (hereinafter the "Agreement"). Under the Agreement (attached hereto as Exhibit "A"), on or before March 1, 2002, Powerline was to remove all spoil material from the Leased Premises and restore the property as defined in the Agreement. Because of unforeseen circumstances, Powerline will be unable to remove all the spoil material prior to the deadline imposed by the Agreement. The parties desire to extend the deadline imposed by the Agreement, but otherwise to continue to operate under the terms and conditions of the Agreement.

NOW, THEREFORE in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the parties agree as follows:

1. Powerline's deadline for removal of spoil material and performance of its obligations set forth in the Agreement is hereby extended through and including March 1, 2003;

2. In conjunction with executing this Extension Agreement, Powerline shall obtain the written confirmation of the surety, Old Dominion Insurance Co., that the $500,000 Performance and Payment Bonds issued in connection with the Agreement (Exhibit "B") shall remain in force through March 1, 2003; and

3. Powerline shall reimburse ADDC for the reasonable cost of the permanent irrigation system required by the Florida Inland Navigation District Lease Extension.

4. All other terms of the Agreement shall remain in full force and effect.

**POWERLINE SAND, INC.**

By: _Hennie DeBeer_ [print]
Its: _President_
Dated: _3/11/2002_

**ATLANTIC DRY DOCK CORPORATION**

By: Edward J. Fleming [print]
Its: President
Dated: _3/28/02_

004.304565.1

#8

# POWERLINE SAND, INC.
## Customer QuickReport
### All Transactions

MARTIN K. EBY CONSTRUCTION COMPANY
WONDERWOOD EXPRESSWAY
EASTSIDE ONLY

| Type | Date | Num | # of Loads |
|------|------|-----|-----------|
| Invoice | 06/14/2001 | 14906 | 11 |
| Invoice | 06/14/2001 | 14915 | 1 |
| Invoice | 06/14/2001 | 14933 | 24 |
| Invoice | 06/14/2001 | 14968 | 10 |
| Invoice | 06/19/2001 | 14983 | 14 |
| Invoice | 06/19/2001 | 15008 | 8 |
| Invoice | 06/19/2001 | 150013 | 16 |
| Invoice | 06/22/2001 | 14945 | 8 |
| Invoice | 06/22/2001 | 14980 | 1 |
| Invoice | 06/22/2001 | 14994 | 101 |
| Invoice | 06/22/2001 | 150021 | 14 |
| Invoice | 07/04/2001 | 150041 | 303 |
| Invoice | 07/05/2001 | 150064 | 27 |
| Invoice | 07/07/2001 | 150118 | 709 |
| Invoice | 07/09/2001 | 150104 | 7 |
| Invoice | 07/12/2001 | 150125 | 6 |
| Invoice | 07/24/2001 | 150145 | 1 |
| Invoice | 07/24/2001 | 150167 | 3 |
| Invoice | 07/24/2001 | 150169 | 4 |
| Invoice | 07/24/2001 | 150170 | 5 |
| Invoice | 07/25/2001 | 150196 | 8 |
| Invoice | 07/25/2001 | 150197 | 32 |
| Invoice | 07/25/2001 | 150198 | 10 |
| Invoice | 07/25/2001 | 150201 | 31 |
| Invoice | 07/25/2001 | 150202 | 5 |
| Invoice | 07/25/2001 | 150205 | 25 |
| Invoice | 07/25/2001 | 150206 | 11 |
| Invoice | 07/25/2001 | 150207 | 8 |
| Invoice | 07/25/2001 | 150213 | 4 |
| Invoice | 07/25/2001 | 150215 | 26 |
| Invoice | 07/25/2001 | 150216 | 29 |
| Invoice | 07/26/2001 | 150217 | 10 |
| Invoice | 07/26/2001 | 150218 | 13 |
| Invoice | 07/26/2001 | 150219 | 32 |
| Invoice | 07/26/2001 | 150220 | 21 |
| Invoice | 07/26/2001 | 150221 | 29 |
| Invoice | 07/26/2001 | 150222 | 7 |
| Invoice | 07/26/2001 | 150224 | 30 |
| Invoice | 07/26/2001 | 150225 | 16 |
| Invoice | 07/26/2001 | 150227 | 28 |
| Invoice | 07/26/2001 | 150228 | 6 |
| Invoice | 07/26/2001 | 150230 | 10 |
| Invoice | 07/26/2001 | 150232 | 11 |
| Invoice | 07/26/2001 | 150235 | 29 |
| Invoice | 07/26/2001 | 150236 | 22 |
| Invoice | 07/26/2001 | 150239 | 23 |
| Invoice | 07/26/2001 | 150240 | 11 |
| Invoice | 07/26/2001 | 150243 | 26 |
| Invoice | 07/26/2001 | 150244 | 6 |

7,694 Loads

#9

9:01 AM
04/24/02

# POWERLINE SAND, INC.
## Customer QuickReport
### All Transactions

| Type | Date | Num | # of Loads |
|------|------|-----|-----------|
| Invoice | 07/26/2001 | 150246 | 8 |
| Invoice | 07/26/2001 | 150248 | 9 |
| Invoice | 07/26/2001 | 150249 | 7 |
| Invoice | 07/26/2001 | 150250 | 1 |
| Invoice | 07/26/2001 | 150252 | 23 |
| Invoice | 07/26/2001 | 150253 | 30 |
| Invoice | 07/26/2001 | 150255 | 20 |
| Invoice | 07/27/2001 | 150269 | 3 |
| Invoice | 07/27/2001 | 150270 | 6 |
| Invoice | 08/02/2001 | 150320 | 33 |
| Invoice | 08/02/2001 | 150321 | 3 |
| Invoice | 08/20/2001 | 150413 | 172 |
| Invoice | 08/24/2001 | 150444 | 111 |
| Invoice | 08/31/2001 | 150500 | 360 |
| Invoice | 09/07/2001 | 150502 | 3 |
| Invoice | 09/07/2001 | 150524 | 265 |
| Invoice | 09/07/2001 | 150530 | 49 |
| Invoice | 09/11/2001 | 150507 | 4 |
| Invoice | 09/14/2001 | 150542 | 7 |
| Invoice | 09/14/2001 | 150548 | 160 |
| Invoice | 09/14/2001 | 150565 | 12 |
| Invoice | 09/14/2001 | 150567 | 3 |
| Invoice | 09/21/2001 | 150576 | 6 |
| Invoice | 10/06/2001 | 150661 | 265 |
| Invoice | 10/06/2001 | 150675 | 6 |
| Invoice | 10/06/2001 | 150678 | 5 |
| Invoice | 10/12/2001 | 150717 | 397 |
| Invoice | 10/12/2001 | 150721 | 8 |
| Invoice | 10/19/2001 | 150743 | 530 |
| Invoice | 10/26/2001 | 150762 | 512 |
| Invoice | 01/04/2002 | 150085 | 637 |

# AMERICAN AGGREGATES
## Customer QuickReport
### All Transactions

| | Type | Date | Num | |
|---|---|---|---|---|
| **MARTIN K. EBY CONSTRUCTION** | | | | |
| **WONDERWOOD EXPRESSWAY** | | | | |
| **EASTSIDE** | Invoice | 11/16/2001 | 66 | 41 |
| | Invoice | 11/19/2001 | 97 | 134 |
| | Invoice | 11/23/2001 | 114 | 113 |
| | Invoice | 11/30/2001 | 139 | 137 |
| | Invoice | 12/14/2001 | 200 | 86 |
| | Invoice | 12/21/2001 | 224 | 15 |
| | Invoice | 12/28/2001 | 239 | 18 |
| | Invoice | 01/04/2002 | 37 | 534 |
| | Invoice | 01/04/2002 | 65 | 580 |
| | Invoice | 01/04/2002 | 162 | 172 |
| | Invoice | 01/07/2002 | 252 | 67 |
| | Invoice | 01/11/2002 | 272 | 151 |
| | Invoice | 01/18/2002 | 304 | 117 |
| | Invoice | 04/01/2002 | 591 | 82 |

# St. Johns River Ferry Service



### A partnership that works for Jacksonville

## Toll Receipt

$ _3.25_

Date _3/4/02_

---

```
GATE PETROLEUM  /9A & HECKSCHER   /JACKSONVILLE, FLORIDA  32226
Number: 6860-8124  3/01/02  Station:  1

(1)                    SCALE           6.00

           taxable sub           0.00
           non-taxable           6.00
     -     0% discount           0.00
              subtotal           6.00

           sales tax             0.00
              TOTAL              6.00

     amount tendered             6.00
           change                0.00

Salesperson Id : CAROLYN

Billing Company: GATE PETROLEUM / CASH
```

ORIGINAL

#10



 **C & A TRUCKING, INC.**
P O BOX 171153
MIAMI, FL 33017
DADE (305) 623-1-66 / BROWARD (954) 433-5666
FAX (954) 438-8573

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/22/01 | 8513 |

**BILL TO:**

POWER LINE SAND INC.
8747 W. Beaver St.
Jacksonville, Fl. 32220-2002
(904) 781-6576
Fax (904) 783-4225

**SHIP TO:**

Wonderwood

| P.O. NUMBER | TERMS | REP | SHIP | VIA | F.O.B. | PROJECT |
|-------------|-------|-----|------|-----|--------|---------|
| | Net 7 | JLC | 6/22/01 | US Mail | 06000-018 | |

| QUANTITY | ITEM CODE | DESCRIPTION | PRICE EACH | AMOUNT |
|----------|-----------|-------------|------------|--------|
| 14 Loads | | DATE: 6/15/01 FROM: Atlantic TO: Mayport | 38.00 | 532.00 |
| | Services | Hauling and Transportation | | |

| | | | | | | **TOTAL** | $532.00 |

#11

**AMERICAN AGGREGATE OF JACKSONVILLE, INC.**

1064

ATLANTIC MARINE, INC                                                    2/27/2002
PROFESSIONAL FEES                    IN OBTAING A LEASE EXTENSION AND THE CONTRACT        3,000.00

*Philed Out 3/1/02*

SUNTRUST              RE-CONTRACT EXTENSION                                    3,000.00

#12

# POWERLINE SAND, INC.

COMPANY NAME: ___
CARRIER NAME: Hiram Ortiz

WEEK ENDING: ___
DRIVER NAME: Macias m

Truck #4/202

| DATE | TICKET# | CUSTOMER | PIT (FROM) | DESTINATION (TO) | QTY | RATE | TOTAL |
|------|---------|----------|------------|------------------|-----|------|-------|
| 7-2-01 | 56350 | | EBY | EBY | | $36.00 | $3,24.00 |
| 7-3-01 | 54651 | | EBY | EBY | | $36.00 | $3,60. |
| 7-4-01 | 59652 | | EBY | EBY | | $36.00 | $1,44. |
| 7-4-01 | 25295 | | ALTA | ALTA | | $40.00 | $7.44 |
| 7-4-01 | 25297 | | ALTA | ALTA | | $40.00 | $40.00 |
| 7-5-01 | 25296 | | South Side | South Side | | $15.00 | $15.00 |
| 7-6-01 | 25300 | | P. Birk | Wonderwood | | $50.00 | |
| | 25304 | | | | | | |
| | 25303 | | | | | | |
| | 25305 | | | | | | |
| | 25304 | | | | | | |
| | 17491 | | | | | | |
| | 17491 | | | | | | |
| | 17490 | | | | | | |
| | 17495 | | | | | | |
| | 17498 | | | | | | |
| | 17497 | | | | | | |
| | 25301 | | Kings Rd. | Wonderwood | 9 hours / 10 hours / 4 hours | $50.00 / $50.00 | $400.00 / $110.00 / 270.00 |

GROSS AMOUNT
BROKER FEE 5%
OTHER DEDUCTIONS   $50.00 / $20.00   $2.00 / $50 / $20.00

TOTAL   $1608

#13



**HORNBLOWER**
M A R I N E   S E R V I C E S

**St. Johns River Ferry Service**
4610 Ocean Street
Mayport, FL 32233-2424
(904) 241-9969
(904) 241-2075 Fax

June 21, 2001

Mr. Hennie De Beer, President
Powerline Sand and Site Work
(904) 781-6576

Dear Mr. De Beer,

It is with regret I inform you that effective immediately, large dump trucks, full or empty, are prohibited from using the St. Johns River Ferry. This decision is based on deck load limitations provided by the naval architect who designed the ferry. The deck was designed to carry vehicles weighing no more than 15,000 pounds each.  Your office, and other material hauling companies, inform me that the weight of a large empty dump truck is a minimum of 25,000 pounds – 10,000 pounds over limit.

I regret the inconvenience this may cause your company.

Sincerely,

Stephan A. Mort
General Manager

Copy:  Gary Seabrook
       Debbie Doran, City of Jacksonville

14

w/ wood exp. Chy Bid

East — 4.00

—  10 load        2 50
    40 mau        1.50 profit
    50            4.00

    ⟨ 2.75 ⟩

C.a. Pine    +0 per load

15.